# CHARLESTON.

CITY OF CHARLESTON v. PUBLIC SERVICE COMMISSION.

Submitted September 11, 1923.  Decided November 27, 1923.

1. GAS—*Company Entitled to Fair Return on Fair Value of Property.*

   A public service company, furnishing natural gas to the public, is entitled to a fair return upon the present fair value of its property used and useful in the public service. Such fair value is to be ascertained as of the time the service is rendered.  (p. 106).

2. SAME—*Company Entitled to Appreciation in Leaseholds Over Investment Costs.*

   Consequently it is entitled to have included in its present fair value, as a rate base for rate making purposes, appreciation in the value of its gas leaseholds over investment cost. (p. 119).

3. SAME—*Evidence of Appreciated Value of Leaseholds Must be Based on Evidence Independent of Earnings.*

   But in a rate making case evidence of the appreciated value of such leaseholds to be competent must not be based upon, but must be independent of, the rates of return or earnings. (p. 107).

4. SAME—*Accrued Depreciation and Depletion Considered in Rate Case.*

   In estimating the present fair value of a natural gas company's property in a rate proceeding, proper consideration should be given to accrued depreciation and depletion.  (p. 109).

5. **SAME—*Utility's Sale to Itself for Less Than Market Value Unauthorized.***

   A natural gas utility should not be permitted to sell the use of its gas to itself for a private enterprise for less than its fair market value, or the price that could be obtained upon the open market. (p. 125).

6. **SAME—*Value of Use of Natural Gas for Manufacture of Gasoline Determined.***

   The reasonable value of the use of the natural gas production of a public service company for the purpose of the manufacture of gasoline therefrom, as shown in the present case, is fifty per cent of the net income derived from the production and sale of the gasoline. (p. 126).

7. **SAME—*Transfer of Property to Corporation Formed by Gas Utility Ignored in Rate Case.***

   Where in a rate case it is shown that a natural gas utility company has caused a corporation to be formed and has transferred to it, with other property, the exclusive right to use all its natural gas for the purpose of extracting gasoline therefrom and receives therefor all the capital stock of the new corporation and is to receive as royalty one-eighth of the gross proceeds of the gasoline as it is produced and sold, and it appears that half the net proceeds therefrom annually amount approximately to three times the eighth of the gross proceeds, such a sale, so far as the gas consuming public is concerned, is unfair; it is a sale made by the company, with the company, and for the benefit of the company and should be ignored in determining the proportion of the income from gasoline which should be charged to the utility.    (p. 127).

8. **SAME—*Sale of Gas by Utility to Parent Companies at Less Than Market Value Unauthorized.***

   A natural gas utility should not be allowed to sell its gas to its parent companies at less than its fair market value and where it does so, in a proceeding to determine gas rates for the utility, it should be treated as receiving a fair market rate for the gas delivered to the parent companies.    (p. 127).

9. **SAME—*Income Taxes of Utility Chargeable as Operating Expenses.***

   Federal corporate income taxes of a public utility are properly chargeable as operating expense.    (p. 129).

10.   *Same—Federal Corporate Excess Profits Taxes of Utility Not Chargeable to Operating Expenses.*

Federal corporate excess profits taxes of a public utility should be paid by the corporation, not by its patrons; they are not chargeable to operating expense in a rate case. (p. 129).

11.   SAME—*Discount in Marketing Securities of Utility Not Chargeable to Capital.*

Discount paid by a utility in marketing its securities is not a proper charge to capital, but is an adjustment of interest, which should be amortized during the life of the securities. (p. 129).

On Petition for Suspension of an Order of the Public Service Commission.

Proceeding by the City of Charleston and others against the Public Service Commission and others. On petition for suspension of an order of defendant granting an increase in gas rates to the United Fuel Gas Company.

*Findings of defendant reversed, and cause remanded.*

*H. D. Rummel* and *R. S. Spilman, C. W. Strickling, Paul W. Scott, W. W. Smith, Harry Scheer, W. T. Lovins, S. P. Bell, W. R. Lilly, H. C. Warth, T. J. Sayre, F. B. Morgan, Geo. S. Wallace,* and *Donald O. Blagg,* for petitioners.

*Fitzpatrick, Brown & Davis,* and *R. G. Altizer* for respondents.

MEREDITH, JUDGE:

This is an appeal of the cities of Charleston, Williamson, Kenova, Spencer and Logan; the towns of Ceredo, Barboursville, Ripley and Ravenswood; Jobbers and Manufacturers Bureau of Huntington; Manufacturers Club of Huntington; Huntington Chamber of Commerce; The Warner-Klipstein Chemical Company, and others, from an order of the Public Service Commission entered August 9, 1923, upon the application of the United Fuel Gas Company for authority to increase its rates for furnishing natural gas to all its consumers,

both domestic and industrial, in the several communities above named and elsewhere in the State of West Virginia.

.The order complained of grants the applicant an increase of five cents per thousand cubic feet on each of its rates then in effect, except as to gas supplied by it in Nitro, West Virginia, the rates at that point being then under consideration by the commission in a separate proceeding, the increased rate to go into effect as to domestic consumers after the meter readings in June, 1923, and as to industrial consumers on and after August 15, 1923, and to continue in effect until March 1, 1924, and until the further order of the commission. It also requires the applicant to file with the commission, on or before March 20, 1924, a statement setting forth its revenue, operating expenses and taxes for the period from September 1, 1923, to March 1, 1924, the revenue derived from gasoline and what changes, if any, the applicant shall have made in any of its rates to other consumers.

Upon filing the petition of appellants an order was entered by one of the judges of this Court on their motion fixing a day for hearing their application for suspension of the aforesaid order. On the.... day of September, 1923, a hearing was had thereon and the order allowing the rate increase was suspended. At a later day in the present term, upon extended oral argument and voluminous briefs, the case was submitted for final decision. Some of the questions presented are novel; many are of such vital importance both to the applicant and to the public as to merit the fullest consideration. In reaching a conclusion we have been required to consider a great variety of data comprising the financial history of applicant for its twenty years existence; reports of expert accountants compiled from its books; the oral testimony and opinions of various witnesses; the orders and opinions of the commission on former applications of the utility for increase in rates; and many other matters bearing on the questions at issue. The utility and the public are entitled to know the facts we have considered as well as the reasons for our de-

cision; for, however sound the legal principles announced in an opinion may be, the opinion itself is of little value unless the vital facts on which the opinion is based are clearly set forth in proper order. For these reasons it is necessary to carry this opinion to greater length than would ordinarily be advisable.

This proceeding was begun June 29, 1921, by the company filing its application for an increase in rates and in effect asking for a rehearing of practically the same questions that were involved in its two former applications, reported as Case No. 585, 1 W. Va. P. S. C. 504, P. U. R. 1918-C, p. 193; and Case No. 845, decided December 19, 1919, 1 W. Va. P. S. C. 561, P. U. R. 1920-C, p. 583. On April 28, 1922, an order was entered granting a substantial increase for certain blocks of its industrial gas and allowing the company to charge schools, hotels, churches and other public institutions the regular domestic rates instead of the preferential rates they had formerly enjoyed.

The Commission in an opinion then filed reiterated its former holdings denying the company's claim for appreciation in its leaseholds, and restricted the leasehold value to investment cost. In case No. 845 it had fixed the rate base at $30,000,000, and found the company was entitled to earn thereon annually $5,000,000, after paying operating expenses, to provide a return upon the investment, calculated at 8%, a depreciation reserve fund, and a fund for the amortization of its leaseholds, the allowance for the last named fund being calculated at $500,000. This amounted to 16 2/3% of the rate base. In its opinion, it found that since December 19, 1919, the company had invested in additions to its property in round figures $3,000,000 and that during this period it had apparently earned in excess of its operating expenses, taxes and return upon its investment, revenues applicable to depletion and depreciation amounting to $2,500,000, so that the net additions to the fair value of the company's property was about $500,000. It therefore found the fair value of the company's property as of April 28, 1922, for the ''purpose

of return upon the investment'' to be $30,500,000.  It further
said:

"The sum upon which depreciation and depletion must be
calculated should be increased to the extent the applicant has
added to its depreciable property since the decision in Case
No. 845, but when depreciation and depletion have been
earned and set aside for the amortization of applicant's in-
vestment, the applicant is no longer entitled to earn a return
upon the sum so earned and set aside, upon the theory that
this fund will be either paid out to the stockholders in the
nature of liquidating dividends or reinvested in other
property.''

It further found that the company's operating experience,
(considering the amount of depreciation accruing), for the
year 1921 showed an apparent deficit of about $1,700,000;
that of this sum $1,000,000 should be made up by charging
it as having received higher rates from its parent companies;
that the remaining deficit was in part due to inadequate
rates, but largely due to a falling off in the volume of its
business, which would correct itself by probable increase in
gas sales; but that it was entitled to an increase in net earn-
ings of $200,000 and for this purpose it was allowed to in-
crease the rates on certain blocks of its industrial gas and to
place schools and other public institutions on the domestic
rate basis.  These increases were to become effective as of
May 1, 1922; the company was directed to keep and report
an account of its income and operating expenses arising from
its gas and gasoline business, as well as additions to capital
for the succeeding six months; the case was retired from the
active calendar to be reinstated thereon for further investi-
gation and orders upon the filing of the report.  On January
11, 1923, the report was filed, and on February 20th, on ap-
plicant's motion, the case was set down for further investiga-
tion and hearing, which finally resulted in the order com-
plained of here.

The questions with which we are concerned upon this ap-
peal are:

(1)  What is a proper rate base, involving (a) whether

appreciation in the value of the company's leaseholds should be considered in arriving at a fair value of the company's property for rate-making purposes; and (b) whether in ascertaining the rate base, deduction should be made for depreciation and depletion.

(2)   What income, if any, from the company's gasoline business should be credited to its gas business.

(3)   The amount of income the company should be charged as receiving from sales of gas to its two parent companies.

(4)   Whether federal excess profits taxes and federal income taxes should be allowed as operating expenses.

(5)   Whether discount paid by the company upon its bonded debt should be allowed as a capital charge.

(6)   Other minor questions.

(7)   Whether the increase of five cents is justified.

### The Rate Base.

(1)   The commission in its order of August 9, 1923, fixed the fair value of the company's property for rate making purposes at $34,000,000.   Upon this matter Commissioner Lewis, who wrote the majority opinion, said:

"In United Fuel Gas Company, Case No. 845 P. U. R. 1920-C, 583, the Commission fixed the rate base, for applicant's property, at $30,000,000, and in arriving at said amount took into consideration the investment cost, reproduction cost new, less depreciation, including tangible and intangible values and property rights in the gasoline business, but did not include any appreciation on leaseholds.   Since the date, up to which the data was prepared upon which said rate base was estimated, the gas company has added practically $4,000,000.00 to its capital account in the way of additions and betterments.   From the record and without the information hereinafter indicated, the Commission sees no reason to modify the rate base heretofore fixed and is disposed to increase the same by the amount of the additions and betterments to said plant since said rate base was fixed and to fix the rate base, at this time, at $34,000,000.00. In fixing said amount, as a base upon which the applicant should receive a return, we have not deducted any-

thing for depreciation or depletion for the reasons here-
inafter set out.''

To this finding appellants object because there was nothing
deducted on account of depreciation and depletion; the Com-
mission in this respect reversed practically all, if not all, of
its former rulings, not only in cases on behalf of this company
but in other similar cases. The company cross-assigns error
because the Commission refused to include in the rate base
any appreciation in the value of its leaseholds.

(a)   We will first consider whether the Commission should
have included as a part of the rate base any appreciation
in the value of the company's leaseholds. The oral evidence
introduced on the hearing of cases 585 and 845 was destroyed
in the Capitol Building fire which occurred January 3, 1921,
and no copies thereof were produced in this case. However,
exhaustive and detailed analyses of the evidence were made by
Commissioner Wiles, in two very able opinions filed by him
on behalf of the Commission in the two cases referred to.
They are found in Vol. 1, W. Va. P. S. C. Rep. pp. 501 and
651. From the opinion in case No. 585, upon the principles
therein stated, the Commission, as of February 28, 1918, ob-
tained ''as the fair present value of the applicant's property
as a rate base the result set forth in the following table:

| | | |
|---|---:|---:|
| ''Total gas investment physical property Dec. 21, 1916, (Seyffert's Exhibit No. 1) | | $18,064,767.71 |
| Less over investment and unoperated acreage | $2,664,756.13 | |
| Less for apportionment for oil investment | 172,088.49 | 2,836,844.62 |
| Value investment 1916 | | 15,227,923.09 |
| Add 10% for overhead charges | | 1,522,792.31 |
| | | 16,750,715.40 |
| Add 10% for going value | | 1,675,071.54 |
| | | 18,425,786.94 |

Deduct 15% accrued depreciation....     2,763,868.03

                                                    15,661,918.91

Add for working capital     550,000.00
Add for increased invest-
    ment ...............     1,550,000.00

                                                      $17,711,918.91"

It then determined the fair maximum present value of the property for rate making purposes to be $17,750,000.00. Upon that application there was deducted from the total gas investment as carried on the company's books the amount of over investment in "unoperated" acreage, or the sum of $2,664,756.18, and the further sum of $172,088.49 for oil investment. At that time the company was carrying 52,349 acres of "operated" and 770,034 acres of "unoperated" leaseholds; the "unoperated" leaseholds were valued on its books at $6.92 per acre, or $5,329,512.26. Of this amount 403,000 acres were held for oil and gas; about 344,600 for gas only; about 1400 acres for oil only; and about 21,000 acres in mineral fee or in fee. The rentals, taxes and other carrying charges upon the whole of this acreage were carried as gas operating expense and paid for from gas earnings. It was claimed by the company that the $6.92 per acre represented the bonus or first rental paid. No evidence appears to have been introduced touching the value of the leaseholds other than the book accounts; nor does it appear that any substantial claim was made to any appreciated values in the leaseholds. The commission found that the company was carrying an unnecessary reserve acreage, and refused to allow even the investment therein to the amount of $2,664,756.18 to be considered as a part of the then present fair value for rate making purposes.

In case No. 845, 1 W. Va. P. S. C. 651, a determined effort was made by the applicant to add to its capital account the sum of $31,778,111.42, which it asserted, was the appreciated value of its leaseholds. It claimed the cost as shown by the company's books was $6,597,224.91. On December 31, 1918, it set up on its books the claimed appreciated value, thus making the book value of the lease-

holds $38,375,336.36, as the result of an appraisal made by Mr. Samuel S. Wyer. Upon this question of appreciated value the testimony of Messrs. Wyer and Davidson and Dr. I. C. White appears to have been taken. It is not in this record; but we can take a fair view of what they said from the opinion of Commissioner Wiles who in discussing their evidence says:

"As of December 31, 1918, applicant added to its capital account the sum of $31,778,111.42, as being in addition to the sum of $22,881,909.34, its actual investment in its gas property as shown by its statement as of that date. This addition to capital was made by applicant upon the theory that the value of its leaseholds and gas producing territory by reason of gas discoveries in the course of their devlopment had increased to that sum in addition to the actual investment cost as set forth upon its books of $6,597,224.91.

The witness Wyer, applicant's engineer, in making his inventory and appraisal of applicant's gas properties, including its leaseholds and gas producing acreage, finds the present value of applicant's gas property, exclusive of the going value and working capital, to be $47,569,022.00, which includes a valuation of $29,860,-500.00 for applicant's gas producing territory.     He places a value of $300 per acre upon the operated acreage, and a value of $100 per acre upon 20% of the unoperated acreage, or that portion which he regards as gas producing territory.

Two theories are presented by the evidence as methods of arriving at the present fair value of applicant's property, used in its gas business.     The method urged by the applicant is that presented by Wyer's report,or reproduction new less depreciation.     This witness values applicant's property, other than its gas acreage, on the basis of average unit prices for the ten year period prior to September 1, 1915, and finds this value, not including going value and working capital, to be $17,708,522.00.     On December 31, 1918, appplicant's acreage was carried upon its books at a value of $6,-597,224.91, and if this sum is added to Wyer's reproduction new less depreciation value of applicant's other gas properties, the total sum, not including allowance for going value and working capital, would be $24,-305,746.91, closely approximating applicant's investment cost as carried upon its books of December 31,

1918. Wyer fixes as the value of applicant's property for rate making, including 10% for going value and $800,000 for working capital, $53,125,928.00. As of December 31, 1919, applicant's balance sheet shows the value of its property to be $55,031,699.70, which includes the sum of $31,778,111.42, representing the estimated increase in the value of acreage owned by the applicant over the investment cost, at which said acreage was formerly carried on the books. Protestant's witness, Hagenah, fixes as a basis for his estimated fair value of applicant's property the investment cost thereof as shown by the company's books as of December 31, 1918, $23,253,588.28. From this he makes deduction of $1,547,385.24, by assigning certain percentages of the value of operated and unoperated acreage, general office building and land, furniture and fixtures to oil investment and further deducting for depreciation and adjutsment and for expenses of financing charged to investment, and for incomplete construction, leaving the net investment cost assignable to gas, $22,371,334.29, to which he adds for working capital, $1,230,423.39, and for going value $2,237,133.43, thereby finding as his estimate of the fair value of applicant's property, as a rate basis, $25,838,891.11. It will, therefore, be observed that the diversity of opinion between applicant's expert, Wyer, in fixing the fair value of applicant's property for rate making at slightly above $53,000,000, and protestant's expert in fixing the same value upon his basis at slightly less than $26,000,000, is due, not so much to any great difference between the value of applicant's property on the basis of reproduction new less depreciation as compared with investment cost, but to the appreciated value which the applicant fixes upon its acreage as a basis for rate making.

As has been stated, on December 31, 1918, applicant's gas acreage was carried on its books at an investment cost of $6,597,224.91. At that time applicant set upon its books as representing the increased or appreciated value of this acreage, the sum of $31,778,111.42, making the total value of applicant's gas acreage as carried on its books, $38,375,336.33. Applicant's witness, Wyer, fixes the value of this acreage at $29,860,500, on the basis of market value, as will be hereinafter shown. Applicant's witness, Dr. I. C. White, fixes the value of these leases including producing wells, at $42,000,000, and applicant's witness, John Davidson, fixes the value of this acreage at $32,711,770. The methods by which

these witnesses arrived at their conclusion regarding the value of this acreage will be hereinafter discussed.

It has been the practice and custom of the applicant when additional acreage is required, to charge to capital the expense of obtaining same, whether bonus, rental or purchase price, and thereafter to charge to operating expenses the delay rentals or royalties paid for carrying such acreage. ' The aggregate of the expense of acquiring this acreage is the sum at which it was carried upon the books of the company as investment on and prior to December 31, 1918. It will be observed by referring to page 502 of Bulletin 43, Case 585, that there has been relatively little variance in the area of the operated and unoperated acreage carried by the applicant from 1911 to 1916, inclusive. The unoperated acreage in 1916 being 770,034, and the operated acreage 52,349, while on January 1, 1919, the unoperated acreage held by the applicant was 696,792, and the operated acreage 56,874, showing a decrease of over 73,000 in the unoperated acreage and an increase of approximately 4,500 in the operated acreage from December 31, 1916, to January 1, 1919. The applicant claims that by reason of the development and extension of its plant and the discovery of rich gas producing territory its gas acreage has appreciated in value over investment cost to the extent of over thirty-one and three quarter million dollars, and that it is entitled to earn a reasonable return upon this increased value, while on the other hand, the protestants take the position that the applicant is entitled to no allowance for any alleged appreciation in the value of its gas acreage, and must be confined to investment cost, plus allowance for overhead, going value and working capital as the basis of its rates.

Mr. Wyer arrives at his conclusion that applicant's leases or gas acreage is worth $29,860,500, or $23,263,276 more than investment cost, upon the basis of exchange or market value of said acreage; it being his opinion that it would sell for that or a greater amount in the open market, from a willing seller to a willing buyer. Dr. White includes in the $42,000,000 valuation he fixes upon this acreage the value of the producing wells drilled thereon by the applicant. He arrives at his valuation by assuming that a certain percantage of the applicant's acreage will produce a given number of million cubic feet of gas, ranging from ten million to as low as two million per acre. He further assumed that the applicant is now earning at present rates a profit of

six cents per thousand upon the gas produced and sold by it, and that it will earn an equal amount upon the gas yet remaining in the ground, which he estimates this acreage will ultimately produce, before it is exhausted. After making certain allowances for depletion in operated acreage, he arrives at the figures above named. The witness, John Davidson, finds his valuation of $32,-711,770, by assuming that of the total operated and unoperated acreage held by the applicant, 137,500 is good gas producing territory, that will yield from eight to ten million cubic feet per acre, and further assuming that the company is making a profit of about 3½ cents per thousand cubic feet from gas this acreage will ultimately yield, upon this basis, he fixes the value of the 137,500 acres so selected at $250 per acre but depreciates the operated acreage, $5,687,400 or 40% for depletion. He estimates the remaining undeveloped territory of 402,417 acres to be worth $10 per acre. Witness is further of the opinion that applicant's gas acreage is worth an additional ten million dollars on account of its value for the extraction of gasoline from the gas contained therein.''

After discussing at length the varied views of courts and commissions as to whether estimates of appreciated values under such circumstances can be allowed as a part of the value of applicant's property in determining the rate base, he further says:

"Applicant's witnesses in arriving at their estimates of the appreciated value of its leaseholds base their conclusions in the one case upon market value and in the other upon earnings, which are dependent upon rates. Assuming that applicant is entitled to an allowance for this appreciated value, are we justified in accepting the opinion of those witnesses as to such appreciated value when based on such premises? The authorities we have examined uniformly hold that an estimate of value of the property of a public utility, based upon market value which is determined by the rate of return or upon earnings when the reasonableness of the return or earnings is in question must be rejected." (Page 670 of same opinion). . . . . . . . .
"In most cases where unearned increment has been allowed it has related to the value of land, which is more readily susceptible of ascertainment than in the
95 W. Va.

case here presented. Since, however, the conclusions of applicant's witnesses are based on inadmissible premises, it seems that even if we were of opinion to allow the appreciated value claimed for applicant's gas acreage, there is no competent evidence before us to show the extent of such increased value." (Page 671 of same opinion.)

In case No. 845 the Commission did not exclude from the value or rate base any investment in unoperated leaseholds, but allowed all the first cost as a part of it. As already stated, that evidence is not in this record; and even it if were, it relates to the supposed values of leaseholds as they were nearly five years ago. The history of the company as set forth in that opinion clearly shows that the "operated" and the "unoperated" leaseholds are constantly shifting and changing, due to the acquisition of new leaseholds and to the abandonment of old ones. Old gas wells are pulled and abandoned from time to time and new ones drilled. Without doubt, the present acreage is in quite a different situation from what it was when the Wyer appraisement was made. The records show that in this interval the following enormous quantities of gas have been sold by the applicant:

> 1919: 51,650,275,000 cubic feet,
> 1920: 52,679,696,000 cubic feet,
> 1921: 44,328,456,000 cubic feet,
> 1922: 46,867,511,000 cubic feet.

Of these amounts approximately 25% was purchased from other operators, the remainder being developed from the company's own acreage. So clearly, the evidence taken on the former hearing as to the appreciated values of the leaseholds would be irrelevant and of practically no value on this application even if it were in this record, because of changes in the leaseholds due to operations, abandonment of old territory, the acquiring of new territory and depletion in the gas field.

Upon the present application no new evidence was offered touching the appreciation of values over investment. No direct effort was made to ascertain the present fair value by showing the cost of reproduction new less depreciation as in

case No. 845. So, even if the company should be entitled to a return upon appreciated values in cases of this character, we would not be justified by the evidence in saying it is entitled to any such return now. Its exhibit No. 1 is a detailed statement of investment in gas property as of December 19, 1919, and shows an aggregate investment in its gas department of $23,402,791.85; to this it adds net additions for extensions, made since final hearing of case No. 845, amounting to $4,090,991.96, or a total investment of $27,493,783.87. To this amount it seeks to add the immense sum of $31,778,-111.42, found by the Wyer appraisal as of December 31, 1918, on account of appreciation of its leaseholds, or an increase over the investment therein of a sum equal to more than 100% of its total investment in its entire plant, including leaseholds, compressor · stations, wells, pipe lines, and distributing systems. There is no evidence to warrant the inclusion of this enormous sum or any part of it in fixing the present fair value of applicant's property and the Commission was clearly right in rejecting it. While under the statute creating the Commission, the rules of evidence are relaxed and liberalized, yet that body can no more find facts without evidence to support them than can courts.

In case No. 845 the Commission reversed its former holdings in the Clarksburg Light & Heat Company case, 1 W. Va. P. S. C. 191, and West Virginia Central Gas Co. case 1 W. Va. P. S. C. 455, by refusing to allow for appreciation of gas leaseholds; upon this point Commissioner Wiles concluded by saying, at page 675:

> "Whatever may be the differences of opinion, as shown by court and commission decisions, as to the ascertainment of fair value for other property of a gas utility, the many elements of uncertainty and speculation that must necessarily enter into all opinions regarding the value of gas leaseholds are so obvious and well known as to render it manifestly unjust and unreasonable to place any value upon such property in excess of its actual cost."

Unless the circumstances be exceptional, we think this is true, and particularly so in a case like the present where the applicant is permitted to charge the rentals and taxes

necessary to carry the leaseholds as an operating expense. Where allowance is made for appreciation, in some jurisdictions the appreciation is also charged against it as income, and thus the effect in the increase in value is somewhat neutralized; but this evidently leads to complications which would always be avoided by fixing the rate based upon the "prudent investment" theory so ably championed in the dissenting opinion of Mr. Justice Brandeis and concurred in by Mr. Justice Holmes in *Missouri* v. *Public Service Commission,* 262 U. S. 276, 43 Sup. Ct. Rep. 544, 67 L. ed. 981, in which he said:

> "The adoption of the amount prudently invested as the rate base and the amount of the capital charge as the measure of the rate of return would give definiteness to these two factors involved in rate controversies which are now shifting and treacherous, and which render the proceedings peculiarly burdensome and largely futile. Such measures offer a basis for decision which is certain and stable. The rate base would be ascertained as a fact, not determined as a matter of opinion. It would not fluctuate with the market price of labor, or materials or money. It would not change with hard times or shifting populations. It would not be distorted by the fickle and varying judgments of appraisers, commissions, or courts. It would, when once made in respect to any utility, be fixed for all time, subject only to increases to represent additions to plant, after allowance for the depreciation included in the annual operating charges. The wild uncertainties of the present method of fixing the rate base under the so-called rule of Smyth v. Ames would be avoided, and likewise the fluctuations which introduce into the enterprise unnecessary elements of speculation, create useless expense, and impose upon the public a heavy, unnecessary burden."

We think the adoption of this as a general rule is to the ultimate interest of the utility, and particularly so to all those utilities that have made heavy outlays during the past few years when prices were extraordinarily high; and that as soon as new low price levels shall have been reached, such utilities will themselves be clamoring for the adoption of the very rule they now so virgorously assail. But we cannot be governed by our individual views. We are bound by

the majority opinion in the last cited case, as well as former opinions of the Supreme Court of the United States, to take into consideration increases in values in determining "fair value" of the utility's property used and useful in the public service, if the increase be shown by competent evidence.   However, as we interpret those cases, the "present fair value" for rate making purposes does not mean the market value of the property as determined by the rate of return or as based upon earnings when the reasonableness of the return or earnings is in question.   If it does then an increase in rates would increase the market value of the property and that would again call for further increase.   This would recur again and again, rates increasing values and increased values requiring increased rates would follow each other to avoid confiscation under the constitution.   This vicious pyramiding would go on and on until the point would be reached where the public would cease patronizing the utility rather than pay the price.   The net result would be that the public would always be compelled to pay "all the traffic would bear," and governmental regulation of the prices to be charged would be at an end.   Its only function in that respect would be to prevent discrimination.

There is some evidence in the record given by Mr. Ralph E. Davis, an engineer, tending to show the amount of gas that may be produced from the company's present wells and also the amount of gas that may be produced from what he calls its "proven" territory.   By his testimony the company seeks to estimate the gas now held by it, both in the "operated" and in the "unoperated" but "proven" territory, aggregating from 100,000 to 150,000 acres.   The witness excludes from his estimates some 650,000 acres held under lease which he calls "wild-cat" territory.   He testifies that about June 1, 1921, he started making his appraisal of these gas reserves—not in money value, but in quantity of gas.   His discussion of the several factors used in determining the reserves is technical and we believe highly speculative. It is too lengthy to set out here in detail.   He concludes that the re-

serve supply in the present wells on September 30, 1921, the date he testified, was 123 billion cubic feet; that on December 30, 1920, that reserve was 144 billion cubic feet and that between those dates the company had used up or produced about 22 billion cubic feet, or at the rate of about 30 billions per year. He estimated that there was a reserve in the "unoperated" but "proven" territory of about 228 billion cubic feet, which would require 780 new wells to produce. He makes a well location for about every 160 acres, but, as already stated, excludes from his estimates about 650,000 acres of "wild-cat" territory held under lease by the company. These two estimated reserves at the time he testified aggregate about 351 billion cubic feet. He assumes the life of the present wells to be ten years and calculates from his estimate of 123 billions to be produced from them that it will require a sale price of 31.95 cents per thousand cubic feet to pay the operating costs and to retire the present going investment. Again, figuring the estimated cost of the 780 new wells necessary to produce the 228 billion cubic feet of reserves in the "unoperated" but "proven" territory, estimating that these and the present wells will require 20 years to exhaust both reserves, he estimates that it will require a sale price of 26.62 cents per thousand to pay the costs of the new wells, operating costs, and to retire the present and necessary future investment. He takes no account of profits and makes no estimate of present values. Of course, the appellants contend that little value can be attached to this character of testimony; and while his method of estimating gas reserves may be the best method known, his estimates are mere estimates and nothing more. We can not see how the Commission, upon such estimates, could fairly ascertain the value of the gas in the ground, at the mouth of the well, or at the city gates, as suggested in the opinion of the Commission. We consider such estimates too uncertain to form a basis for a valuation of the company's leaseholds; and in this respect we agree with the Commission. Therefore, under any view of the present record, the company has not shown by competent evidence that it is entitled to any appreciated values upon its leasehold property.

### Depreciation and Depletion.

(b.)   We will now consider whether the depreciation or depletion or both, accruing since December 19, 1919, should be deducted from the $34,000,000.00, fixed by the Commission as the present fair value or rate base.  Commissioner Lewis distinguishes between the two, as applied to a natural gas utility, applying the term "depreciation" to deterioration of the company's physical properties, such as compressor stations, pipe-lines, gas wells, meters and property of like character; and the term "depletion" to the gradual reduction of the company's gas reserves by its production and use or sale of gas.  He says:

> "The stockholders of the company are entitled to have their investment kept intact and to earn, over and above operating expense and taxes, a fair return upon their investment, the necessary amount of depletion as hereinafter mentioned, and a sum when properly invested from time to time, which will be sufficient to replace these large units when necessary and which, when the gas is exhausted, will return to the stockholders their investment in this physical property, (that is, compressor stations, pipes, etc.), less the salvage value thereof.  The fund just mentioned is what is often called depreciation or a retirement fund and is applicable to all utilities alike.  The investment should not be reduced by reason of the accumulation of this fund unless a part of the physical property is retired, and then it should be reduced to the extent of the value of the property retired, less the salvage, or unless a part of it is returned to the stockholders and then it should be reduced to the extent of the amount so returned."

After stating that in former cases the Commission has allowed from eight to ten per cent of the rate bases annually for depreciation and depletion, but that it has never segregated the two or determined what portion should be set aside for depreciation, he concludes that the evidence in the record does not disclose what per cent of the rate base should be allowed for depreciation, and that this is necessary before proper rates can be fixed.

He then takes up the question of depletion.  He states the present investment in the company's leaseholds amounts

to over $6,000,000; that this has been included in the rate base, but that it is not to be considered as a part of the investment in the physical property, that is, the property upon which a depreciation charge is allowed. He further says:

"The gas company is entitled to earn operating expense and taxes, the necessary amount to contribute to the depreciation reserve fund each year, a reasonable return upon the fair value of its property devoted to serving the public and a just compensation for its gas that is used in serving the public. The just compensation for its gas is called depletion. In order to arrive at what the yearly depletion, should amount to, it is necessary for us to ascertain the just compensation or market value of the gas, either in the ground, at the mouth of the well, or at some other location. . . . The value of the gas in the ground is not a part of the rate base, because it represents the value of the commodity that the utility is selling. The gas is not being used in the same sense as the physical property for the benefit of the public, but is being exhausted for the benefit of the public and, should be paid for, by the consumers, as the exhaustion or sale takes place."

After stating his disapproval of estimates of the value of the gas in the ground in any limited territory, because of the great uncertainty of the quantity and other factors, he concludes:

"If the value of the gas or the total amount of depletion is fixed by an amount representing the appreciation of the leases or at the value of the gas under a given territory, the annual depletion should then be deducted, from said appreciation or value of the total amount of gas, but should not be deducted from the rate base. The money derived from depletion belongs to the utility and may be returned to it in the way of dividends or may be reinvested by it in other property," citing *People ex rel. Pennsylvania Gas Co.* v. *Pub. Ser. Com.*, 204 App. Div. 73, 198 N. Y. S. 195.

It is somewhat difficult to follow the Commissioner in his reasoning, due, we think, to his confusion of the methods of ascertaining the present fair value for rate making purposes. He proposes to calculate "depreciation" on the investment cost of the plant, excepting, of course, the leaseholds, but "de-

pletion'' on the market value of the gas used,—as he would have it, ''at the city gates''. Just what would be the rate base under such a method we are at a loss to determine. The market price of the gas to the consumer is the very thing the Commission is to fix. If it ascertains the market value at the city gates, of course, it would be a comparatively simple matter to determine the distribution cost. But fixing the market value at the city gates is not a simple matter; and whether that value be fixed at that point or elsewhere, the Commission would have the same problems that have always confronted it in rate cases. We do not see how, in any event, separating ''depreciation'' and ''depletion'' and treating them in the manner proposed by the Commission can simplify the matter. It occurs to us that it would complicate the problem. Of course, such separation in order to determine the amount of return to be allowed for each is proper, but when the separate amounts for ''accrued depreciation'' or ''accrued depletion'', whether actual or theoretical, are ascertained, we see no reason for treating them differently thereafter. Each in effect reduces the value of the property by that much and their aggregate represents the total reduction. It occurs to us that the value of the property of the company used and useful in the public service should constitute the rate base, and that of course includes the value of the gas in the ground. However, the Commission has its own problems, and we do not desire to complicate them by prescribing narrow methods for their solution. What we do disapprove of is the proposition of fixing rates to be allowed for depletion at the market value of the gas consumed when found at the city gates. If its market value in the ground could be found with any degree of certainty without basing it upon the rates of return or earnings, then there might be some support for the Commission's proposed methods. We have been led to say this much, not because of what the Commission has already done, but because of what it forecasts it may do.

We think the Commissioner is in error also in stating that the Commission in case No. 845 did not include any part of the value of the company's gas in the ground in the rate base. It may not have included any appreciation in the lease-

holds over their investment cost, but that investment cost, amounting to more than $6,000,000, or more than 20% of the rate base, was included as a part of it. In every instance the investment cost of the leaseholds, that is, the first rental cost or bonus paid, has been included as a part of the rate base; this alone amounts to nearly 25% of the total investment in the whole property. Upon the prudential investment theory of ascertaining the present fair value of the company's property devoted to the public service, that investment cost of the leaseholds represents the present fair value of the leaseholds or the total value of the gas in the ground; but upon whatever theory the present fair value be found, the value of the leaseholds and the value of the gas in the ground represents one and the same thing. We do not, however, mean to say that the leaseholds may not be worth much more than their investment cost, but that does not affirmatively appear in the record, and in ascertaining their present worth and fixing rates based thereon, consideration should be given to the fact that the rentals paid to keep the leases alive have been paid by the public.

The protestants claim that the rate base of $34,000,000, found to be the fair value of the company's property for rate making purposes, should be reduced by the depreciation accrued since December 19, 1919. We use the term here as also including depletion. In case No. 845 the Commission found the fair value to be $30,000,000; that was December 19, 1919. In doing so, it considered the property as an inseparable whole, taking, as the opinion says, "the investment cost and reproduction cost new less depreciation, including tangible and intangible values and its property rights in the gasoline business." In the present case, on April 28, 1922, when the first order was entered, in ascertaining the value of the company's property, it started with the $30,000,000 base, added thereto $3,000,000 for additions and betterments, and deducted from the total, $2,500,000 for depreciation and depletion that had accrued and been earned since December 1919, thus making the rate base $30,500,000. By the order under review, the Commission reversed its former finding,

assumed that the original valuation of $30,000,000 remained
a constant factor and added thereto $4,000,000 for additions
and betterments, thus making the base $34,000,000. It did
not again attempt to find the value on the basis of reproduc-
tion cost new less depreciation. In fact there seems to have
been very little new evidence touching values introduced on
this hearing. That a very considerable depreciation actually
accrued during this period of more than three years there
can be no doubt; but how much does not definitely appear.
Beginning with 1917 the company has annually set up on its
books an allowance for depreciation. We need not discuss
these figures in detail, our purpose being to arrive at a correct
principle that should govern the Commission in dealing with
the question. We do not understand the company's counsel
to contend that depreciation should never in any event be
taken into account in determining the fair value as a rate
base. If the reproduction cost new less depreciation plan is
adopted, of course, by its very terms depreciation is to be
deducted from the reproduction cost; and the result is the
rate base. If the value of the property is found by appraising
the component parts or the plant as a whole, then the age
of the parts, the use to which they have been put, their prob-
able useful life, and in the case of a natural gas field, the
amount of gas withdrawn and the future life of the field must
be considered. In other words, the condition of the property
at the time of the appraisal must be found. From necessity,
in such cases the depreciation must be considered to ascertain
the present fair value. That is exactly what was done in
*People* v. *Pub. Serv. Com.*, 198 N. Y. S. 195, the case cited by
Commissioner Lewis for the proposition that depletion should
not be deducted from the rate base. Of course, it should not
have been deducted from the rate base in that case. The fair
value was first found by making proper deduction for deple-
tion; this then was the rate base; and having so found the
rate base, to deduct again for depletion would have amounted
to double deduction. And for that very reason the court re-
versed the Commission in that case. The Commission had
found upon evidence deemed by it as competent and con-

vincing that the company's fields were then worth $12,000,000.
From this it deducted $8,707,869 for accrued depletion in
finding the rate base. In reversing this finding the court said:

> "The Commission had already found the present day
> actual fair value of the gas fields and rights was $12,-
> 000,000. There was necessarily involved in the making
> of this finding all proper deductions for depletion or
> depreciation. No further deduction for actual deprecia-
> tion, therefore, could consistently have been made."

But in the present case the Commission refused to make
a deduction for depreciation in the first instance, even though
at least $2,500,000 had been earned therefor; as found in the
opinion rendered April 28, 1922, and though it is admitted
that the accrued depreciation amounted to much more than
that. The fact that there was a very considerable depreciation
constantly accruing was the only reason justifying the com-
pany's application for a rate increase. It's application is
based on that ground. It was and is earning much more
than 8% on investment cost, but it claimed the rate did not
furnish sufficient return to cover all the depreciation. It
must be remembered too that the value of $30,000,000 ascer-
tained in Case No. 845 was not based solely on investment
cost. As shown by Seyffert's exhibit No. 1, filed on behalf
of the company, the "gas investment" was only $22,797,840.-
43; additions thereto of "incomplete construction, office build-
ing, and discount on bonds" brought it up to $23,402,791.85.
If the item of "gasoline investment" amounting to $1,194,-
754.06 be added, the total amounts to only $24,597,545.91.
The difference between that and the $30,000,000, or approxi-
mately $5,400,000, may have represented intangible values,
such as "going value" and "overhead" as was allowed in case
No. 585, or it may have represented in part appreciated value
in the company's property. As the opinion does not analyze
the different elements making up the $30,000,000 valuation
we can not say; but it is apparent that the rate base in-
cluded other elements aside from investment cost. True,
that value was fixed after deduction was made for depre-
ciation accrued up to that time; but depreciation did not then
stop; it is a continuing factor. If the investment in De-

cember, 1919, was but $23,402,791.85 and there has been added by way of betterments and additions $4,000,000 since, this makes a total investment only about $27,500,000, a difference between that and the rate base found of about $6,500,000. However, it appears from exhibit No. 6, filed by Mr. John Jirgal, protestants' witness, that on April 23, 1923, the total gas investment was only $26,276,083.30, as shown by the company's books. From this he makes certain deductions which it seems to us are proper and reduces the investment to $24,810,863.54; if to this there be added 5½% for working capital, and 10% for going concern value, the result is $28,656,547.00, as a rate base. Basing his calculations on the fair value of $30,000,000, and figuring the depreciation at 6% only, although the Commission had in fixing rates made a greater allowance therefor, he finds the depreciation calculated only on investment to be $4,483,559; that the property and plant additions made to December 31, 1922, were $3,486,121; deducting the accrued depreciation from the aggregate of the $30,000,000 fair value and the property and plant additions of $3,486,121, leaves for the "present fair value" $29,002,562, as a rate base, or almost $5,000,000 less than that found by the Commission. We think the argument of company's counsel against deduction of depreciation from the former rate base of $30,000,000 is founded on the theory that that valuation was found from the investment cost alone, but such is not the case. The question is not whether depreciation should be deducted from investment cost; but even if it were, there is another factor to be considered, namely, the payment of dividends. These amount to $24,670,000. We think it is quite apparent from the record that a part of this amount represents in part the fund which the public has heretofore paid for depreciation and depletion; to that extent the stockholders have had returned to them a part of their original investment. The Commission has not seen proper to determine the dividends properly paid out of returns for that purpose, and the dividends paid out of the depreciation fund; nor has it proportioned the dividends paid as between the oil investment and the gas investment. It seems to us that these questions should be settled on a proper basis and the

amount of dividends paid out of the depreciation fund heretofore paid in by the consumers of gas, if any, should be found. If the valuation should be based upon the investment cost, then the dividend paid out of the depreciation fund should be deducted therefrom.

The company's counsel contend that the funds paid by the consumers for depreciation belong to the company; and that so long as it renders efficient service and keeps its plant in 100% condition, it may do with them as it pleases; and that is true. It may pay them out to its stockholders as extra dividends; to that extent it is a return of so much of the stockholders' original investment, and reduces the investment by that much. Or, it may re-invest the funds so paid in in additions and extensions; by so doing, it increases its capital by that amount, and thereafter it is entitled to earn a like return thereon as if it were a part of the original investment. But assume that the amount so paid in is used, not for additions or extensions, but for replacements, for example, to purchase new gas fields in lieu of old ones exhausted; in such case is the amount so paid in and re-invested to be added to the original investment and a return to be allowed upon the aggregate? Or is the amount so re-invested to be deducted from the original investment and a return to be allowed upon the residue as a rate base? If the investment cost is made the rate base, we answer "No" in both instances. The replacements are here assumed to keep the original investment intact. And if the value of the property is found by appraisal, the depreciation and the replacements would both necessarily be considered. That, as we understand, was the point decided in *People* etc. v. *Pub. Ser. Com.*, 198 N. Y. S. 193, when the court said:

> "Money collected from customers for depletion of capital by reason of the consumption of natural gas and used for *replacing* and not *increasing* the capital account should not be deducted from the capital invested in determining the rate base."

That case is so frequently cited and so much relied on here because of the illustration therein made that it merits further consideration, as we think it is often misunder-

stood. The commission found upon evidence satisfactory to it that the company's gas fields had a fair value of $12,000,000; to do this it necessarily considered the then accrued depletion, and having done that, found the sum stated to be the fair value. But it then found that of the fund paid in by the public for purposes of depletion, $8,707,869 had been used by. the company to increase capital instead of to replace capital. The court reversed the case on the facts by finding that the utmost that had been contributed for depletion was only $4,155,439.25, and that this had not been used to increase capital but to replace it. The court in its opinion used the following illustration:

"The Commission seems to have determined that all sums of money collected from consumers for depletion of capital and carried to depreciation account, less such sums as might be traceable into free investments, whether used for replacement or enhancement of capital, constituted a fund which, whatever its converted form, could not be included in reckoning the capital constituting a proper rate base, That this can not be true is shown by a simple illustration. Assume that the relator were presently embarking in the natural gas business; that it owned ten wells each having its own acreage of gas fields; that each well with its fields was fairly worth $10,000; that consumers would so deplete its gas supply that in ten years the ten wells and fields would be exhausted. It is plain that in such case the consumers should annually pay, in addition to a suitable charge for service, the value of one gas well and field, or the sum of $10,000. If the consumers paid such a charge for ten years, then the relator might each year buy a new gas well with new fields, or at the end of ten years buy itself ten new wells with gas fields, and thus place itself, not in a better, but in the exact position occupied by it when it began business. Clearly in such case the relator should be allowed a continuance of its charges for gas based on the full value of its capital without deductions. If sums annually collected from consumers for depletion of capital and actually used for such replacement must be deducted from capital invested to determine a rate base, then it is not apparent why such collections are ever permitted."

We think the illustration is apt. The capital depleted each

year is annually renewed out of the depreciation fund, and the investment kept intact by replacements. In that event in the illustration, the rate base therefor remains $100,000, just what it was in the beginning; hence if the depreciation fund is re-invested for purposes of replacement, the amount so used ought not to be added to or subtracted from the original investment to determine the rate base. If it were added thereto, without deducting depreciation, then there would be a pyramiding of capital from year to year, and the consumer would be paying rates upon the very fund his contributions had created. Thus the rate base would be increased in the illustration annually by $10,000, so that at the end of the tenth year it would be $200,000, while the value of the property would be but $100,000; on the other hand, if depreciation were deducted from capital without adding thereto the amount used for replacements, at the end of ten years the capital account would be exhausted, zero would be the rate base, and yet the property used by the utility to serve the public would be worth $100,000, upon which it would receive no return whatever.

But in the present case we think it appears clearly that the commission found the value of the company's property to be $34,000,000 without sufficient evidence; its finding that the $30,000,000 valuation as of December 19, 1919, remained the same in August, 1923, was a mere assumption, without any facts to support it, and especially so in view of its finding on April 28, 1922, that there had been then an accrued depreciation of at least $2,500,000, and for which payment had already been made by consumers. We hold that upon the present record, an account of the accrued and earned depreciation should have been taken and it should have been given consideration in ascertaining the rate base. This position is sustained by the decisions of the Supreme Court of the United States in *Knoxville* v. *Knoxville Water Co.*, 212 U. S. 1; our own case of *Clarksburg Light & Heat Co.* v. *Pub. Serv. Com.*, 84 W. Va. 638, and numerous other cases. For these reasons we can not justify the rate base found.

It is possible that if proper allowance be made for appreciation in the value of its leaseholds, the company is entitled

to a return on a valuation of $34,000,000. If this appreciation be shown by competent evidence, it is entitled to the increase; but evidence of such increased value should not be based upon, but should be independent of, the rates of return or earnings of the company. Rate making is analogous to condemnation proceedings. If a railway should undertake to condemn land, evidence of the value of the land for other than railway purposes would be competent in determining its value; while evidence of its value for railway purposes would not be competent. If the increased value of the leaseholds be so enormous as to make rates based thereon inequitable and unfair to the public, the commission will know how to deal with it.

## Income from Gasoline.

(3). The company began in a small way in 1916 to produce gasoline. It is produced in general in three ways: (1) by refining petroleum, though the company produced none by that method; (2) by compression of natural gas; and (3) by absorption from natural gas. By the third method, of which, according to witness Denning, there appear to be a number of different processes, the quantity of gasoline which may be produced from natural gas is largely increased over the second method; as a consequence, increasing quantities of gasoline are being produced that way, though the quantity produced by refining petroleum, amounting in 1917 to about 93% of the total production is so large that it controls the market price. According to witness Jirgal, who testified from the only available data, the process of refining gasoline from petroleum is so much more expensive than the process of absorption from natural gas that the profits from the latter method are much greater. The applicant, therefore, in recent years has been producing gasoline from practically all the gas sold by it, including what it produces and what it buys.

In 1916 the company had an investment in the gasoline business of $279,972.45, and net earnings of $299,293.45. Net earnings for the first six months of 1917 were $722,204.81,

according to the commission's findings in case No. 585, 1 W. Va. P. S. C. Rep. 501. In that case the commission determined that 50% of the net earnings from gasoline should be credited to the gas department. A keen analysis of the question is there made by Wiles, Commissioner, who gives very cogent reasons for the finding. While he does state that the decision, in the absence of definite data, is somewhat arbitrary, yet it is quite clear from what was then done and from subsequent hearings that the commission intended to and did place upon the company the burden of showing the propriety of any change before any change should be made.

In case No. 845, the same question arose, that is, what proportion, if any, of the net earnings from gasoline should be credited to the gas department, and the commission adhered to its former ruling, there being no new evidence to cause any change. 1 W. Va. P. S. C. Rep. 848.

It again was presented in the present case, and in the opinion rendered April 28, 1922, the commission said:

"We held in this and other cases that the reasonable value of the use of gas production for the purpose of the manufacture of gasoline should be credited to gas expense and allocated between the wholesale and retail departments and between localities on the basis of sales. This reasonable value we have heretofore fixed at one-half the net earnings arising from the manufacture of gasoline. No reason has been urged for the change. *In re: United Fuel Gas Co.,* P. U. R. 1918-C 1; *In re: United Fuel Gas Co.,* P. U. R. 1920-C 583; *In re: Hope Natural Gas Co.,* P. U. R. 1921-E 418."

When that finding was made the company owned ten gasoline stations, distributed at various points in its field, which with its tank cars and other equipment represented an investment of $1,561,827.85 (Jirgal Exhibit No. 7). This investment had not been treated as a part of the investment in the gas department. It also owned 70,655.91 acres, including leaseholds and fee, operated for oil or gas or both, costing $2,044,835.66, and an unoperated acreage in West Virginia of 676,573.05 acres, costing $4,714,281.87; the total unoperated acreage in West Virginia, Kentucky and Ohio being

755,588.79, at an investment cost of $4,751,112.07, the total aggregating $6,795,947.83.

On May 1, 1922, the company caused to be organized the Virginian Gasoline & Oil Company and by deed conveyed to it:

1. The company's ten gasoline stations, together with the lands upon which they are located.

2. 127 tank cars, the gasoline on hand in tanks on the premises and the company's interest in a contract between it and the Atlantic Refining Company, dated March 31, 1923.

3. All the oil in 11,337.55 of operated and 313,326.65 of unoperated acres in West Virginia.

4. All the company's oil interest in 302.6 of operated and 81,328.25 of unoperated acres in Kentucky.

5. A lease on 7.85, acres of land made by Barren Creek Coal Company, including the company's carbon black plant and improvements thereon.

The company reserved the natural gas in the foregoing properties. The consideration for the transfer was 8,897 shares of the capital stock of the Virginian Company and the assumption by it of $1,717,000 of the company's bonds. There was an adjustment made which required the gas company to pay the Virginian over $17,000 in cash.

Separate assignments were made for each county of the oil interests in the two states; these aggregated about 406,-000 acres, and were made subject to an oil operating contract, entered into the same day which provided that the Virginian Company might operate the leaseholds for oil and the United Fuel Gas Company might operate them for gas, under prescribed conditions; the Gas Company to retain the leases and to pay all the delay rentals except those on which oil is being produced or may be produced. Upon discovery of oil on an undeveloped tract, the oil company may take over the well, by paying the expense and accrued delay rentals from May 1, 1922. There are other provisions but they are not essential.

On the same day the companies entered into another contract, called the Gasoline Contract, which caused the controversy here. In substance, it provides:

1. That the Virginian Company will so operate each of

the gasoline plants which have been constructed along the natural gas pipe lines of the United Fuel Gas Company and any other plants which may hereafter be constructed by the Virginian Company along such lines, so as to free, so far as reasonably possible the gas passing through such lines from moisture or other substances which may obstruct the passage of the gas through the lines, and so operate such plants as to cause no material interference with the flow of natural gas through the pipe lines in the process of marketing the same.

2. That the Virginian Company will not use any process, method or device in extracting the gasoline from the gas that will materially reduce the commercial value of the gas for heating and lighting purposes.

3. That it will deliver to the United Fuel Gas Company free of charge at the outlet of each of the casinghead gasoline plants at Clendenin, Walgrove and Porter stations the residual gas which passes through them, during such time as the Gas Company shall provide the necessary appliances to receive the gas.

4. That the Virginian Company will pay the Gas Company a royalty of one-eighth of the gross proceeds of sale of gasoline produced by it from the Gas Company's gas; such payment being for the privilege of extracting the gasoline from the gas.

5. That the Gas Company covenants and agrees that the Virginian Company shall have the exclusive right of extracting gasoline from the natural gas transported through the gas company's lines, to the extent vested in the Gas Company; that it may alter, enlarge or dismantle any existing plants and at its own expense construct and operate additional plants along the natural gas pipe lines, now or hereafter owned by the Gas Company, in West Virginia, Kentucky or Ohio, so long only as it keeps its covenants.

The commission by its order of August 9, 1923, held that the one-eighth of the proceeds of the sale of the gasoline was a sufficient return for the extraction privilege instead of half of the net proceeds as decided at three former hearings on application of this company and another upon an

application of Hope Natural Gas Company. Among the reasons assigned by Commissioner Lewis are:

(1)   That extracting the gasoline cleans the gas.

(2)   That it enables the Gas Company to serve its patrons more efficiently and economically because the maintenance expense is not so great, since the gasoline tends to rot or pulverize the rubber rings used in packing or calking the large pipe line joints.

(3)   That the price of gasoline is very much depressed and, "Under the present market price and probably the future market price of gasoline, one-eighth of the gross revenue may exceed one-half the net revenue derived from the operation of the gasoline properties in question."

(4)   That "The matter of separating the gasoline business from the gas business is one that appeals direct to the discretion of the managing officers of applicant. These officials are the ones to decide what is a proper consideration for the gasoline rights. It is not the function of this Commission to substitute its judgment for the judgment of such officials. So long as such officials do not abuse their discretion and judgment by making unfair contracts or for the purpose of obtaining an advantage over the gas consumers of applicant, their action or conduct should not be disturbed by this Commission even though they are dealing with another company in which they are interested. The contract in question in this case, the relation of the parties thereto and the facts and circumstances surrounding its execution are very similar to the contract, the relation of the parties thereto and the facts and circumstances surrounding its execution, considered and discussed by the United States Supreme Court in the case of *State of Missouri ex rel. Southwestern Bell Telephone Company* v. *Public Service Commission of Missouri*, U. S. 67 L. ed. 619."

The first and second grounds assigned by Commissioner Lewis may be admitted, though no figures are presented showing economy in operating costs because of the extraction of the gasoline. Too much weight should not be given thereto for that reason. The third ground is wholly untenable. A decline in the price of gasoline would likely produce a greater percentage of decline in net revenue than

in the gross revenue, but there is nothing in the record tending in the least degree to show that "under the present market price and probably the future market price of gasoline, one-eighth of the gross revenue may exceed one-half of the net revenue derived from the operation of the gasoline properties in question." This is clearly demonstrated by witness Jirgal's exhibit No. 7, showing the company's operating results from the gasoline business for six years, the last eight months' record being taken from the Virginian Company's books; from which we obtain the following:

|      | Gallons    |    | Selling price |      | Gross Revenue | Net Revenue    |
|------|------------|----|---------------|------|---------------|----------------|
| 1917— | 9,805,137  | at | 21.08c | ____ | $1,914,993.98 | $1,339,910.56 |
| 1918—10,405,417 |  | at | 22.24c | ____ | 2,314,201.43 | 1,598,470.74 |
| 1919—12,902,984 |  | at | 22.43c | ____ | 2,894,409.38 | 2,187,301.21 |
| 1920—14,046,300 |  | at | 25.73c | ____ | 3,614,510.10 | 2,681,620.69 |
| 1921—13,835,690 |  | at | 19.92c | ____ | 2,756,084.14 | 2,065,519.61 |
| 1922—16,462,339 |  | at | 18.42c | ____ | 3,032,057.05 | 2,343,504.44 |

A division of the gross revenue and net revenue,—one-eighth of the gross and one-half of the net for each year produces the following:

|      | | One-eighth Gross | One-half Net |
|------|------|---------------|---------------|
| 1917 | _____ | $239,374.25 | $ 669,955.28 |
| 1918 | _____ | 289,275.18 | 799,235.37 |
| 1919 | _____ | 361,801.17 | 1,093,650.60 |
| 1920 | _____ | 451,813.76 | 1,340,810.35 |
| 1921 | _____ | 344,510.52 | 1,032,759.80 |
| 1922 | _____ | 379,007.13 | 1,171,752.22 |

It will be observed that half of the net revenue each year is about three times the eighth of the gross revenue; that while in the Commissioner's figures he calculates one-eighth of the gross revenue for 1922 at $380,000, one-half of the net revenue was $1,171,752.22; hence the third reason for the Commissioner's finding has no basis of fact whatever to support it. If the future prices should show a decline, and the net revenue should decline in greater proportion than the gross revenue, the gas consumer would have to share in

the decline and the protestants are willing to do so; but that such decline will wipe out the great difference between the eighth of the gross and the half of the net revenue is extremely improbable. If it does, the gas consumer can stand his share of the loss.

The fourth reason assigned is that so long as the officials of the company have not abused their discretion in dealing with the company's gasoline rights, the commission should not interfere. That is entirely proper; but the commission goes further and says that "These officials are the ones to decide what is a proper consideration for the gasoline rights"; that in large measure is true. But is that true under the facts of this case? We think the correct principle was stated by Commissioner Wiles in his opinion in case No. 585, above referred to, where he said:

"In our opinion it is the duty of the utility to sell the use of its gas in the gasoline process for its reasonable value, as if dealing with a stranger at arm's length. In other words, a gas utility should not be permitted to sell the use of its gas to itself for a private enterprise for less than its fair market value, or the price that could be obtained if said production should be offered upon the open market. The reasonable value of that use is the measure of the earnings from that source that should be properly credited to production and transmission expense."

In this connection it is proper to state that the record shows that the Columbia Gas & Electric Company owns 51% and the Ohio Fuel Supply Company owns 49% of the capital stock of the United Fuel Gas Company; that on June 22, 1922, the United Fuel Gas Company declared a dividend of the 8897 shares of the capital stock of the Virginian Company, par value $100 each, which it had received in part payment for the oil and gasoline properties; that it directed transfers of this stock to be made to these two stockholders, which was accordingly done; and that since May 1, 1922, the gasoline business has been conducted in the name of the Virginian Company, the Gas Company being paid the one-eighth royalty. It is quite apparent that this whole transaction was in effect a sale made by the United Fuel Gas

Company to itself for the sole benefit of itself. While the earnings upon this stock as a matter of accounting do not go into its treasury, they go directly into the treasury of its parent companies, where they would ultimately go if the United Fuel Company drew the dividends in the first instance. That this was not a sale made at arm's length is admitted by company's counsel; indeed, we think it is tacitly admitted that the sale was not a fair sale. The price received and to be received in royalties is not the price that would have been demanded and received from a stranger; such price would have been much higher; the findings of the commission in the Hope Natural Gas Company case referred to and the evidence of witness Charles E. Krebs shows that 50% of the net profits is a fair return for the privilege of extracting gasoline from natural gas where the buyer builds his own gasoline plants. Here the plants were in operation; the commission had found 50% a fair return on three prior hearings. Can we say that such a sale made by the company, to the company, for the benefit of the company, under the circumstances here disclosed, shows a fair and unbiased judgment of the company's officials as to the value of the extraction privilege? We should say not. Not a single official of the company was willing to testify that the sale was at a fair price or that the royalty to be received is sufficient. Nor do we find any similarity between the facts and circumstances disclosed here and those referred to in Commissioner Lewis's opinion as appearing in *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Commission*, 43 U. S. Sup. Ct. Rep. 544, 67 L. ed. 619. There the commission excluded an expense item of $174,048.60 for rentals and services which the company had actually paid to the American Tel. & Tel. Co. The court found that this item was 55% of the 4½% of gross revenue paid by the company to the American Tel. & Tel. Co. as "rents for receivers transmitters. induction coils etc., and for licenses and services under the customary form of contract between the latter company and its subsidiaries. Four and one-half per cent is the ordinary charge paid voluntarily by local companies of the general system. There is nothing to indicate bad faith. So far as appears, plaintiff

in error's board of directors has exercised a proper discretion about this matter requiring business judgment.'' We think this case supports the contention of the protestants and furnishes no authority to the contrary. The charge there made by the parent company was the customary charge. It rendered real service. No customary rental or royalty for the privilege of extracting gasoline from natural gas is shown here,—but an arbitrary charge. Under these circumstances the commission had a right to wholly disregard the deed and contracts made between the Gas Company and the Virginian Company and in determining the question of rates to be allowed the Gas Company to treat the matter as if the Gas Company had title to the property as before.

Another fact should be considered. The investment cost of the company's gas leaseholds, now amounting to more than $6,000,000, from the beginning has been calculated as a part of the rate base; on this the company has by the order of August 9, 1923, been allowed a return of approximately 16% or a little more than $1,000,000; and this, notwithstanding the fact that the company is allowed to charge the rentals to keep the leases alive to gas expense. In the meantime, under the present arrangement, the Virginian Company, without paying a dollar's expense toward keeping these leaseholds intact or to the production of gas therefrom, may use the gas in its gasoline process, make a clear profit in 1922 of more than $2,340,000 thereon and pay therefor but $380,000. Such an arrangement is, in our opinion, exceedingly unfair. We think the extraction privilege is worth at least 50% of the net profits and that proportion should be charged to the gas business.

*The income the company should be charged as receiving from sales of gas to its two parent companies.*

3. It will be recalled that the two parent companies, the Columbia Gas & Electric Company and the Ohio Fuel Supply Company, respectively, own 51% and 49% of the capital stock of the United Fuel Gas Company. The company for several years had been selling gas in enormous quantities to these and other gas companies at wholesale rates. For

the most part, these sales were made under special contract.

In 1921 and 1922 the total sales of gas, as distributed between wholesale and retail consumers, were as follows:

|  | 1921 M. cu. ft. | 1922 M. cu. ft. |
|---|---|---|
| To retail .................... | 13,182,298 | 14,872,918 |
| To wholesale: | | |
| Col. Gas & Elec. .............. | 7,464,572 | 9,412,164 |
| Ohio Fuel Supply ............. | 6,558,874 | 7,841,268 |
| Centr. Ky. Nat. Gas Co. ...... | 1,776,629 | 1,501,323 |
| Louisville Gas & Elec. ......... | 2,529,629 | 2,270,355 |
| Portsmouth Gas Co. ........... | 1,135,679 | 1,191,212 |
| Hope Natural Gas Co.......... | 5,337,551 | 3,841,636 |
| Pittsburg & W. Va. Gas........ | 3,967,160 | 5,772,484 |
| Montgomery Gas Co. .......... | 24,774 | 97,605 |
| Industrial Gas Co................ ..| 41,655 | 63,542 |
| Snow Hill Consumers Co........ | | 3,004 |
| | | |
| Total Wholesale ............ | 28,836,523 | 31,994,593 |
| Grand Total ............... | 42,018,821 | 46,867,511 |

The rate to the Columbia Gas & Electric Co. and the Ohio Fuel Supply Co., the parent companies, has been very low; for 1922 it was 7 cents per thousand. During the same year the Hope Natural Gas Company paid 15.51 cents and the Pittsburgh & West Virginia Gas Company paid 16.83 cents, or an average on their total of 15.7 cents. The commission held that the company was not receiving sufficient from its two parent companies, and the revenue received from them should be increased by at least $1,000,000, in other words, these two companies should help make up any deficiency in revenue. Protestants claim that the $1,-000,000 increase is not sufficient, viewed in the light of the quantities of gas sold; that these two companies should pay at least as much as the average price charged the Hope Natural Gas Company and the Pittsburgh & West Virginia Gas Company. If this were done, the two parent companies would have paid for the gas sold them in 1922 $1,463,-398.93 more, instead of $1,000,000 more than under the old

rate. Without discussing in detail these various special contracts and the supply furnished these various companies during the cold weather months, we think it clear that the Hope Natural Gas Company and Pittsburgh & West Virginia Gas Company in practical effect enjoy no special advantages over the Columbia Gas & Electric and Ohio Fuel Supply; hence the two latter companies should pay as high a rate as the two former. By so doing it increases the amount to be paid the utility, at least in accounting, $463,398.93 more than the amount fixed by the commission. The record shows that a very considerable part of the company's investment has been made to supply these wholesale customers and they should bear their share of the burden.

### Federal Excess Profits and Income Taxes.

4. Should federal income taxes and federal excess profits taxes be allowed as an operating expense? The commission seems to have allowed both, amounting in the aggregate to more than $400,000. That federal income taxes should be allowed as an operating expense of a public utility there can be no doubt, since the decision of the Supreme Court of the United States in *Georgia Ry. & Power Co.* v. *Georgia Railroad Commission,* 43 U. S. Sup. Ct. Rep. 680, P. U. R. 1923-D page 1, decided June 11, 1923. Point four of the syllabus there says:

> "The disallowance of the Federal corporate income tax as an operating expense of a public utility company is erroneous."

This settles whatever doubts may have arisen under the decision in *Galveston Electric Co.* v. *Galveston,* 258 U. S. 388, 66 L. ed. 678, 42 Sup. Ct. Rep. 351, P. U. R. 1922-D 159.

The record shows that the excess profits tax paid by the company is about one-half of the total item reported, all federal taxes being reported in the aggregate. In the opinion rendered April 28, 1922, in this case the commission held that only the income tax was to be allowed as an operating expense, thus excluding excess profits taxes. In case No. 663, *In re Hope Natural Gas Co.,* 1 W. Va. P. S. C. Rep. 839, the commission at page 852 of the opinion said:

"We decided by an order herein of January 11, 1919, that excess profits taxes should be paid by the corporation and not its patrons and consumers. If the applicant does not earn more in excess of operating expenses and property taxes than a sum sufficient for a fair return and for depreciation and amortization, it will pay no excess profit taxes upon its gas business."

We think that statement is true here, and that excess profits taxes are not to be allowed as operating expense. Re: *Los Angeles Gas & E. Corp.* (Cal.), P. U. R. 1922-A, 283. This will make a difference in the net income in the present case of more than $200,000, and increases it by that amount over the commission's estimate under the final holding.

### Discount on Bonded Debt.

5. One item of $193,782.85 for financing improvements and betterments, shown on page 10 of Jirgal's Exhibit No. 1, and deducted by him from the total of the book cost of the gas property, appears to represent discount and expenses on the sale of the company's securities, certain bonds sold in August, 1921. This deduction was proper. All the authorities seem to agree that discount on securities is not a proper charge to capital, but is simply an adjustment of interest. 1 Whitten on Pub. Ser. Corp. §322, p. 273. The discount should be amortized during the life of the securities.

### Other Minor Questions.

6. As this case will go back to the commission for further investigation, we think it proper to say that careful consideration should be given to the matter of adjustments detailed in the report of Mr. Jirgal. His accounts seem to be exceptionally clear. The commission in its findings should analyze the elements making up the rate base in these cases. While this requires an enormous amount of labor on the part of the commission, the utility and the public alike are entitled to know the basis of its findings. When the findings are in general terms neither party can determine the relative weight given to the various factors.

### The Increase in Rates.

7. We have already stated that we could not upon the

record justify the commission's findings as to the rate base of $34,000,000. If its finding of April 28, 1922, that there was accrued and earned depreciation amounting to $2,500,-000, be correct, then this amount should be deducted from the $34,000,000, leaving the rate base $31,500,000, as the record now stands. That may be changed upon further hearing and inquiry. Upon a rate base of $34,000,000 the commission found the company was entitled to earn annually $5,500,000 above operating expenses and taxes, which is approximately 16%; that its books show its gross revenue for 1922 to be $6,849,816 and its operating expenses $3,630,845, leaving $3,218,971, for depreciation, depletion and a fair return. The commission adds to this $380,000, being the one-eighth of the gross revenues from gasoline, making $3,598,971, for depreciation, depletion and fair return. Deducting this from $5,500,000 leaves an apparent deficit of $1,901,029. The commission required the company to increase its revenue $1,000,000 by increased charges to its two parent companies, leaving a balance of the deficit $901,029, instead of $500,000, as stated in the commission's public bulletin. Assuming that these figures are correct, and making the corrections heretofore noted, we restate the account thus:

Gross revenues from gas sales, 1922......  $6,849,816
Operating expenses and taxes ..........   3,630,845
                                         -----------
Net revenue .......................   3,218,971
50% net income from gasoline .........   1,171,752.22
                                         -----------
Total ...........................   4,390,723.22

Increased revenues from sales to Columbia
  Gas & Electric and Ohio Fuel Supply
  at the average rate paid by Hope Nat.
  Gas Co. and Pgh. & W. Va. Gas Co. of
  15.7c .............................   1,463,398.93
                                         -----------
                                         $5,854,122.15
Add estimated federal excess profits tax,

treated by commission as expense...... 200,000.00

| | |
|---|---:|
| Total net revenue ................. | $6,054,122.15 |
| Total estimated return ............ | 5,500,000.00 |

Excess of return over estimate allowed.. $554,122.15

Under Jirgal's Exhibit No. 6, the net earnings for depletion, depreciation and return on investment would be $6,269,236.09; indeed, if proper adjustments were made, we can not say that this would not be correct. It is apparent to us that the company under the present rates is receiving a fair return upon the rate base of $34,000,000; and as we can not justify that rate base, for still stronger reasons we can not justify the rate increase.

For the foregoing reasons the findings and order of the commission will be reversed and set aside, and this proceeding remanded to the commission for such further investigation and order as may be proper.

*Findings of Public Service Commission reversed; remanded.*