UNITED FUEL GAS CO. v. PUBLIC SERV-
ICE COMMISSION OF WEST VIR-
GINIA et al.

(District Court, S. D. West Virginia. May 10,
1926.)

No. 1517.

**1. Gas 14(1)—Corporation supplying natur-
al gas entitled to allowance for upkeep and
value of plant.**

Corporation supplying natural gas *held* en-
titled to set aside sum to keep plant as good
as new so far as possible and desirable, and, in
addition, allow it at end of estimated length of
profitable life of plant to make good its value.

**2. Gas 14(1).**

Allowance of rate sufficient to provide for
amortization of gas plant renders necessary
depreciation allowance sufficient only to keep
it in state of industrial efficiency during period
of estimated length of profitable life.

**3. Gas 14(1).**

Allowance of $404,333 for annual deprecia-
tion on gas plant, which in previous eight years
had annually expended $225,000, *held* sufficient.

**4. Gas 14(1).**

Allowance of 3.65 per cent. per annum for
amortization of gas plant having estimated
profitable life of 18 years, *held* sufficient.

**5. Gas 14(1).**

Eight per cent. return on investment of gas
company *held* sufficient, in view of provision for
amortization of property at end of estimated
profitable life.

**6. Gas 14(1)—Profits from gasoline ex-
traction included in return on gas company's
property.**

In determining whether gas company re-
ceives fair return on property, Public Serv-
ice Commission may include actual profits re-
ceived by its stockholders from gasoline ex-
tracted therefrom by corporation organized by
gas company with the same stockholders under
contract granting gas company one-eighth of
gross profits.

**7. Gas 14(1).**

In determining gas company rates, earn-
ings will be credited with difference between
amount paid by stockholders for large quanti-
ties of gas and actual value thereof.

**8. Evidence 571(7).**

Commissions and courts, in determining
rates, must give great weight to expert evidence
of cost of reproduction of public utility proper-
ties because of inability of arriving at fair
market value.

**9. Gas 14(1).**

Burden of establishing that Public Service
Commission and state court, in fixing rates,
were wrong in determining value of gas com-
pany's property, is on gas company seeking in-
junction.

**10. Gas 14(1)—Gas under unproved lands
held not used in public service.**

Though gas company's acquisitions of gas
acreage were proper, where it had sufficient gas

14 F.(2d)—14

in its proven acreage to supply its customers
for 5 years, and its public service patrons for
25 years, gas under other lands *held* not used in
public service so as to entitle company to re-
turn on its value.

**11. Gas 14(1).**

State cannot require gas company to sell its
gas within state if higher prices can be ob-
tained elsewhere.

**12. Gas 14(1).**

Gas company, selling gas at wholesale free
from regulation, *held* properly denied increase of
rates by Public Service Commission, even con-
sidering regulated part of business by itself.

McDowell, District Judge, dissenting.

In Equity. Suit by the United Fuel Gas
Company against the Public Service Commis-
sion of West Virginia and others, wherein
certain municipal and private corporations
intervened. On application for an injunction
pendente lite. Motion denied.

Harold A. Ritz, of Charleston, W. Va., for
plaintiff.

Howard B. Lee, Atty. Gen., and Fred M.
Livezey, of Huntington, W. Va., for Public
Service Commission of West Virginia, for
original defendants.

H. D. Rummel, and Robert S. Spilman,
both of Charleston, W. Va., and Paul W.
Scott of Huntington, W. Va. (Donald O.
Blagg, of Charleston, W. Va., and C. W.
Strickling, George S. Wallace, and Harry
Scherr, all of Huntington, W. Va., on the
brief), for intervening defendants.

Before ROSE, Circuit Judge, and Mc-
DOWELL and McCLINTIC, District Judges.

ROSE, Circuit Judge. On the 2d day of
April, 1925, the United Fuel Gas Company
filed in the United States District Court for
the Southern District of West Virginia at
Charleston its bill in equity. The defendants
named in it are the Public Service Commis-
sion of West Virginia, Birk S. Stathers, Ern-
est D. Lewis, and James J. Divine (the mem-
bers of the commission), Howard B. Lee, the
Attorney General of the state, and Fred M.
Livezey, counsel to the commission.

On the 17th day of April, 1925, sundry
municipal and private corporations obtained
leave to intervene. Both the original and the
intervening defendants have answered. The
latter will be called the protestants.

The bill states certain facts which are not
in dispute, the more important of which are
that, for a considerable time, the plaintiff has
been engaged, among other things, in produc-
ing and selling natural gas in West Virginia
and elsewhere. Some of the plaintiff's gas
business is with domestic and industrial con-

sumers in that state, and some is with wholesale purchasers. Certainly since 1916 (case 482, 1 Decision Public Service Commission of West Virginia, 238) and perhaps since 1913 (United Fuel Gas Co. v. Public Service Commission, 73 W. Va. 571, 80 S. E. 931), the rates charged by the plaintiff to consumers in West Virginia have been regulated by the Public Service Commission. With some relatively unimportant exceptions, those now prevailing have been in force since 1919. The plaintiff, claiming that they did not give a reasonable return upon the value of its property devoted to West Virginia public service, on April 26, 1924, filed a new and higher schedule, the going into effect of which was at once suspended by the commission. After a full hearing and the taking of much testimony, the commission on March 24, 1925, by a vote of two to one, held that the old rates yielded an adequate return and refused to let the plaintiff exact the new. P. S. C. W. Va. bulletin 91. The plaintiff charges that the rates thus continued in force are confiscatory. It asserts that the defendants, the Attorney General of the state, and the counsel for the commission, are charged with the duty of enforcing certain statutes which subject to fine and imprisonment any public service corporation and any of its officers or agents who disobey the orders of the commission. It says that as a consequence, its property is being taken from it without due process of law. Injunctive relief is prayed.

Judge McClintic refused a temporary restraining order. Answers were filed which denied that the rates prescribed by the commission will not yield a fair return on the plaintiff's property used in the public service. The application for an injunction pendente lite was heard by the court as now constituted.

### The Plaintiff and the Commission.

Up to date, this is the latest scene in a practically continuous performance, which began on May 21, 1917, more than eight years ago, with a petition of the plaintiff, numbered on the commission's docket No. 585, for permission to increase its rates to domestic and industrial consumers. On February 28th following, the commission, by a report and order (bulletin 43) granted some of the relief asked for and refused the rest. In less than ten months, the plaintiff presented a new application, docketed No. 845. It asked to be allowed to make another raise to domestic consumers and to discontinue all service to industrial. This proceeding was pending for a year, when on December 19, 1919, the com-

mission filed a report and order (bulletin 51) by which some but not all of the advance sought was allowed, but permission to cut off gas to industrial consumers was denied. After an interval of eighteen months, the plaintiff was back with a petition, No. 1251, which the commission accurately described as in practical effect an application for a rehearing of the two earlier cases, No. 585 and No. 845, respectively. On April 28, 1922, the commission, by a report and order (bulletin 70), made some additional allowance to the plaintiff in the matter of rates, and suspended further action to await the result of six months' operation under a prescribed system of accounting. On the 20th of February, 1923, the information which the commission had sought being then before it, the plaintiff asked that the case be further heard. Such request was granted, with the result that on August 9, 1923 (bulletin 82), the commission allowed a considerable temporary increase, and retained the proceedings to await the result of six months' operation, to end March, 1924. From this order the present protestants appealed, as the state law permitted, to the Supreme Court of Appeals, which on November 27, 1923 (City of Charleston v. Public Service Commission, 95 W. Va. 91, 120 S. E. 398), reversed and set aside the findings and order of the commission and remanded the case for "such further investigation and order as may be proper."

Nothing further was done until April 26, 1924, when the plaintiff filed a new and higher schedule of rates. Upon the plaintiff's motion, the nominally new proceeding, No. 1516, was consolidated with No. 1251, which was still open, and which, as has been stated, was in itself really an application for a rehearing of the earlier cases, No. 585 and No. 845. It was in this consolidated proceeding that the commission refused permission to make the desired increase, and thereby according to the plaintiff confiscated part of its property without due process of law.

### The Case in this Court.

By stipulation, the testimony and exhibits submitted to the commission were treated as before us and some additional testimony was put in.

In the course of this long drawn out controversy, many contentions have been made. Some of them are at once novel and difficult. Questions are raised, authoritative answers to which will affect public and private interests of far greater magnitude than those directly before us, considerable as the latter are. The law of public rate regulation is still in the

making. Courts will do well to move cautiously and to speak sparingly. While stating all the facts which to either lawyer or layman can seem relevant, they should attempt to decide nothing not required for the full, fair, and just determination of the actual cases before them. Upon the record before us, it will be easier for us to keep ourselves within such limits if we depart somewhat from the usual order of discussion in rate cases and deal with other questions before attempting to appraise the value of the plaintiff's property, used and useful in the public service.

## Depreciation and Amortization.

The plaintiff employs in its business a plant which, like that of every one else, is subject to the wear and tear of use and misadventure. In order to keep itself in condition to render efficient service and to protect itself against the gradual decay of its investment, it must annually expend or lay aside a sum sufficient to offset deterioration. The plaintiff, moreover, is faced with a problem with which most public utilities are not concerned. It does not make the gas it sells. That has existed for milleniums, and plaintiff now owns much of it, or, at all events, has rights to or in it. When it is used, it is gone forever. A portion of plaintiff's annual receipts, therefore, represents the proceeds of the sale of its property. Moreover, when the plaintiff's gas supply shall become so far exhausted that it can no longer be profitably transported and sold, a large part of the value of its physical plant will vanish, for, in the location in which it now is, and for the uses to which it is now put, much of it will be worthless, no matter in how good a state of physical preservation it may then be. It is possible that some of it may be put to profitable use where it is. Other portions may have an appreciable salvage value, but a good deal of it will inevitably prove a total loss. In short, in addition to setting aside something every year to make good ordinary depreciation, the plaintiff must make arrangements adequate for the amortization of a considerable part of its investment.

[1, 2] Some of its expert witnesses have attempted further differentiations between the various kinds of depreciation or consumption. These may be useful from a bookkeeping standpoint, but we agree with the commission that, for the purposes now in hand, such refinements are unnecessary. The plaintiff is entitled to set aside annually such sum as will be needed to keep its physical plant as good as new in so far as that is possible, or, if possible, desirable, and in addition, such sum as will at the end of the estimated length of the profitable life of its plant, make good its value. This allowance for amortization will in itself render unnecessary quite so liberal a provision for depreciation as might otherwise be called for. If the plant could look forward to a life of indefinite duration, the depreciation allowance should be large enough, not only to make the repairs and replacements which would be practicable and useful, but also to offset the deterioration in value incident to lapse of time, and which does not necessarily result in any immediate impairment of efficiency of operation, and may not be discernible by inspection, but which has nevertheless certainly taken place. When, however, provision is made for the amortization of the plant as a whole at the end of a definite and not very long period, the allowance for depreciation may properly be confined to the sums necessary to keep it in the meanwhile, up to a high state of industrial efficiency.

## Depreciation.

[3] What sum should the plaintiff annually set aside for depreciation? In the fourteen and a half years, beginning July 1, 1909, and ending December 31, 1923, it actually expended for that purpose an average of $203,463.61 per annum. In the first six and a half years of that period, its annual outlay on that account was a trifle over $140,000; in the last eight, not quite $255,000. It has spent in that way all that it usefully could. Its expert witnesses say that its plant is now in such condition that for operating purposes it is practically 100 per cent. efficient. The commission is willing to allow it for the future $404,333 per annum. As the record now stands, we are not justified in holding that more is required.

## Amortization.

[4] The commission allows for amortization a sum equivalent to 4.15 per cent. of the fair value of plaintiff's property. This is clearly more than sufficient. It does not take quite $3.90 paid in at the end of each of eighteen years, compounded annually at 4 per cent., to amount to $100 at the time the last payment is made. The plaintiff's expert witnesses say that the probabilities are that it has considerably more than eighteen years of profitable business life ahead of it. Even when the exhaustion of its gas holdings shall bring its activities to an end, not all of its property will be worthless. There will be an appreciable portion of it which, without ex-

pensive reconstruction, may be put to other uses, and there will be some salvage in a considerable part of the remainder. The income set apart for amortization will come into plaintiff's hands with more or less regularity through the whole of each twelve-month period, and in large part will be available before the end of the year. It is highly probable the plaintiff can so use the funds of its amortization reserve so as to get more than 4 per cent. per annum for them. Savings banks will pay it as much.

Taking everything into consideration, we are convinced that 3.65 per cent. per annum will be a generous allowance for amortization.

### Rate of Return.

[5] The commission has fixed 8 per cent. as the rate of return to which the plaintiff is entitled. In view of the ample provision for the amortization of plaintiff's property at the end of eighteen years, this is certainly liberal.

The year 1925 was a comparatively good year for the railroads, and yet the net return upon the book values of their property was less than 5 per cent., and such values are doubtless far below the present reproduction costs. It is true that the natural gas business is in its nature far more speculative than that of the railroads, but the allowance for amortization minimizes, if it does not altogether offset, its greater hazards..

It follows, therefore, that the plaintiff will have no reason to complain that it is not receiving a fair return on its property, if, after deducting from its net earnings $404,333 per annum for depreciation, the balance left shall be sufficient to pay 11.65 per cent. upon the fair value of its property used and useful in the public service; that is 8 per cent. in addition to 3.65 per cent. for amortization.

### Earnings.

Upon the face of plaintiff's books as they were kept, its net income from the gas portion of its business for the year 1923, was, after deducting operating expenses and taxes $3,995,802.82. The commission finds that to this sum should be added, as the result of certain bookkeeping adjustments, the sum of $187,533.93. We do not understand that this finding is attacked. In any event, we are satisfied it is justified.

### Profits from Gasoline Extraction.

[6] It pays the plaintiff, before delivering its gas to its customers, to take out the gasoline which is in it when it comes from the wells. Some years ago the plaintiff organized another corporation to do the actual work of extracting the gasoline, and afterwards turned over the stock of this new company to its own stockholders, of whom there are but two, both corporations. It made a contract with its gasoline extracting subsidiary, or went through the form of making a contract with it, as you please, by which it was to receive one-eighth of the gross profits of the extracting. The Public Service Commission of West Virginia has repeatedly held that, in determining whether the plaintiff's stockholders are receiving a fair return on their property, it may, so far as concerns the matter in hand, inquire what the gasoline arrangement really profits them. The commission has determined that what comes to them is more accurately measured by a sum equivalent to one-half of the subsidiary's earnings than it is by the one-eighth of the gross profits. This conclusion was expressly sustained by the Supreme Court of Appeals of West Virginia in the case of City of Charleston v. Public Service Commission of West Virginia et al., 95 W. Va. 91, 120 S. E. 398, and in which the parties were identical with those now before this court. We do not find it necessary to consider whether the issue there passed upon is now res adjudicata, because, even if it is not, we are as to it of one mind with the highest court of the state. For the year 1923, one-half of the net earnings from gasoline extraction amounted to $934,393.41.

### Sales of Gas to Stockholders.

[7] This, however, does not represent all the plaintiff earned for its owners. The plaintiff's two stockholders took from it large quantities of gas, amounting in the year 1923 to more than one-third of all sold by it. The price to one of these stockholders was 7 cents per M. C. F. and to the other 7½ cents. For the two, it averaged 7.279 cents. The plaintiff admits that this gas was worth much more. In determining what return plaintiff made to those interested in it, we do not understand that it questions that there should be added to its earnings as they appear upon its books the difference between the price paid to its stockholders and what it could have gotten from others for the gas they took.

### Value upon Which Return Was Earned.

Assuming for the moment that the finding of the commission in this respect is accurate, the net revenues of the plaintiff for the year 1923 were as follows:

On the face of its books......... $3,995,802.82
Add: Adjustments ............ 187,533.93
Profits of gasoline extrac-
tion .................. 934,393.41
Return to its stockholders
from gas sold them below
cost .................. 2,143,661.46
                                 _____
Total .............. $7,261,391.62
If from this be deducted:
Depreciation allowance of    404,333.00
                                 _____
There remains........ $6,857,058.62
—which is 11.65 per cent. on $58,858,872.27.

The plaintiff says that the commission, in its calculation, did not take into account the fact that, if it had received the extra $2,143,-661.46 from its stockholders, it would have had to pay federal income tax thereon, and that therefore its gains would not have been measured by the full amount, but only by the difference between it and the extra income tax which would in that event have been levied upon it. The record as presented to us, does not make it clear whether the commission did or did not make any allowance for this income tax complication. In any event, the protestants have figured the gains for the plaintiff's stockholders on a basis much more favorable to it, and have incidentally taken fully into account the increased income tax the plaintiff would have had to lay out had its stockholders paid in cash for the real value of the gas they received. They calculate $1,495,497 to be the minimum net addition which should be made on account of the gas so furnished, which gives an income sufficient to pay 11.65 per cent. on $53,295,228.84, a sum more than two and a half times as much as plaintiff's investment, including therein all the money it has borrowed and still owes.

### Value of Plaintiff's Property.

What is the present worth of plaintiff's property used and useful in the public service?

### Its Investment.

In this connection, it will be well to inquire what is the amount of the plaintiff's investment. As already stated, the amount its stockholders have paid into it, is not more than $6,000,000. On December 31, 1923, it owed an aggregate of $12,060,343.34. It follows that all the money which ever went into it did not exceed $18,060,343.34.

### Cost.

It is true, however, that the cost of the property it now has is greater than the total of its investment.

For convenient discussion of the questions most sharply controverted, it will be expedient to divide what the plaintiff possesses into three classes—namely, first, its tangible property, comprising lands, buildings, pipe lines, machinery, tools, working capital, and a hundred other more or less similar things; second, its going concern value; and third, its other intangible possessions, consisting of interests or rights in gas still in the ground. For the first class—that is, its tangible possessions—it had paid up to December 31, 1923, $19,-945,582.16. As we shall later see, there is a dispute as to what its intangible holdings actually cost, but the commission found that they stood on its books at $6,343,329.67. And for the present purpose they may be so taken, although some of the accountants put the figure somewhat higher. That is to say, the aggregate cost of the plaintiff's present property of all kinds was not greater than $26,-288,911.83. This aggregate exceeds by $8,-228,568.49 all the outside money that by any possibility ever went into the property. Where did it come from? A small part has been supplied by money laid aside for depreciation but not yet actually expended for that purpose. The greater part of it, however, represents the sums reserved out of earnings for the purpose of amortizing the plant when its period of useful life shall come to an end.

It will now be desirable to examine with care plaintiff's claim that both classes of its properties are now worth much more than it invested in them or that they in any sense cost it.

### Tangible Property.

As already stated, it spent for its tangible property $19,945,582.16. These expenditures were made at different times and consequently in dollars having varying purchasing power. Translating all of them into the currency of 1923, and using for that purpose the index figures of the Department of Labor, we find that, expressing them in dollars of that year, the cost was $24,546,309. The plaintiff's experts estimate that the reproduction costs of these properties would be $37,054,425, which exceeds the book cost by $17,108,842.84, or by almost 86 per cent. As we have seen a part of this excess, that is the portion represented by the difference between $24,546,309 and $19,945,582.16, or $4,600,726.84, is due to the decrease in the purchasing power of the dollar, but the estimated reproduction cost new exceeds the actual cost in dollars of 1923 as they are arrived at by using the index figures named, by the difference between $37,054,425 and $24,546,309; that is, $12,508,116, or 50 per cent.

Labor and such materials as went into plaintiff's construction work may and doubtless have increased in cost at a higher rate than have the average of all commodities; the latter including food stuffs and agricultural products generally. The witnesses agree that this is so, but, so far as we can recall, no attempt has been made to work out with precision the effect of these factors. We are satisfied that upon the most liberal estimate they cannot account for more than one-third of the $12,508,116, the difference between what would have been the cost of the plaintiff's property expressed in dollars of 1923 as determined by the use of the index figures of the Department of Labor and what its expert witnesses say would now take to reproduce it. Where does the other $8,000,000 or more come from?

### Overheads.

We are persuaded that it is almost altogether due to the liberality with which the witnesses estimate the outlay which in reproduction would be made for direct and for general overheads. The latter alone are figured at $7,063,311. There is no possible question that in almost all of these rate cases the overhead charges included in the estimated cost of reproduction greatly exceed any sum that the utility actually paid out for such purposes. A large and widely distributed plant is ordinarily a growth extending over many years. Its property is managed by its officers, and its construction is financed in installments. The large overheads estimated by the experts are simply not incurred. The plaintiff's expert based his calculation concerning them largely upon the experience he had in the erection of other plants, especially one in Alberta, Canada. He apparently ignored the history of the construction of the plaintiff's, about which he was testifying, for it is certain that no such expenditures for overheads were in fact found necessary by it. The writer of this opinion had on another occasion to give some consideration to the great discrepancy there almost always is between what the experts, in making up a reproduction cost, estimate must be expended for overheads and the sums the particular utility actually laid out for such purposes. Chesapeake & Potomac Telephone Co. of Baltimore City v. Whitman (D. C.) 3 F.(2d) 938, 947, et seq.

A well-managed public utility almost always builds up an organization which, as part of its every day work and without appreciable additional cost, can and does superintend the making of such additions and extensions as from time to time may be required. The possession of such a staff is not the least important asset going to make up what is called going concern value. Perhaps one of the reasons why reproduction cost, although one of the weightiest elements in the determination of present fair value, is not necessarily controlling, is the very fact that, in arriving at it, the experts always include an expenditure for overheads far in excess of any which the utility ever incurs.

The plaintiff is here because it is dissatisfied with the ultimate conclusion to which the majority of the commission came, as well as with some of the findings of law and fact by which that decision was supported. The justice of its criticism is the issue upon which we must pass. Whatever we or others may think upon that point, we believe there can be no question that all the commissioners united to give a very sympathetic ear to many of plaintiff's contentions. For illustration, they substantially accepted Mr. Uebelacher's estimate that the cost of reproducing new the tangible property of the plaintiff would be $37,054,425 although the expert witness for the protestants had said that it could be done for $1,663,273 less money; that is, for $35,-391,152.

The only deduction the commission made from Mr. Uebelacher's total was an item of $254,332. The plaintiff had expended that amount in sinking dry or worthless wells. It might have reasonably claimed that such an outlay was a part of its prudent investment, but the commission could not see the way clear to hold that such expenditure could be fairly included in the reproduction cost of the property used and useful in the public service. Deducting from Mr. Uebelacher's total of $37,054,425 this $254,332, the commission found that the cost of reproducing new the plaintiff's tangible property used and useful in the natural gas portion of its business to be $36,800,093.

[8] Very possibly, it would cost something in that neighborhood to duplicate in one continuous operation all the plaintiff's present plant. It is true that there is no occasion for any such duplication. Plants of the size and more or less scattered character of that of the plaintiff are seldom or never constructed in the manner assumed by the reproduction theory. Nevertheless, because there is usually no other way of arriving even approximately at the fair market value of the utility's property, commissions and courts are forced to give great weight to what the evidence shows the cost of reproduction would be. In so doing, however, it is only fair to

bear in mind how seldom a purchaser of such a utility, no matter how free a market for it there might be, would feel justified in paying for it as much as it would cost to reproduce all of its property, even after making proper allowance for any physical depreciation it had undergone.

No wise man would incorporate in a newly constructed plant duplicates of not a little which in the old still served its turn well enough. The money could be used to far better advantage.

### Depreciation of Plaintiff's Tangible Property.

The plaintiff's plant was not new, and all agree that it is worth less than if it was, although there is the usual difference as to the extent of its depreciation. The plaintiff through its witness Mr. Uebelacher, fixes $8,433,105 as the amount which on that score should be deducted from the reproduction cost new. We have not been able to make certain whether any part of the $254,332 of his estimate of the cost of sinking dry wells, disallowed by the commission, is included in his allowance for depreciation, although it is quite possible that somewhere in the wilderness of tables and exhibits the question is answered. Fortunately, the item is not so large as to make certainty as to it essential.

The protestant's expert, Mr. Hagenah, calculates the depreciation at $11,421,972. The principal and indeed the only substantial difference between him and Mr. Uebelacher is that the latter took into account nothing other than the observed physical depreciation, while he held that, when the normal life of any item of the plant will probably or certainly be cut short by the depletion of the supply of gas, it should be treated as now proportionately less valuable, because, no matter in how good physical condition it is, it has already run out a part of its definitely limited span of life. There cannot be room for much difference of opinion that a pipe line, which will lose all its value at the end of say eighteen years, because there will no longer be any use for it where it is and because it will cost more to dig it up than it will be worth when brought to the surface, is not in any reasonable sense of the term worth as much as would be one out of which forty years of useful service can be expected. From the standpoint under consideration, it would make little or no difference whether the pipes had been newly laid or had been in the ground for years. In either case, they would be efficient for eighteen years, and after that they would both be equally valueless. Logically, Mr. Hagenah would seem to have followed the right method of ascertaining the present fair value of the property. On the other hand, Mr. Uebelacher would be correct if what the plaintiff is entitled to earn is to be figured with the primary purpose of preserving to it the money it has prudently invested in the public service. Nevertheless, the commission rejected Mr. Hagenah's and accepted Mr. Uebelacher's figures for depreciation. It follows that, if from the $36,800,093 which they found to be the cost of reproducing new all of plaintiff's tangible property, they deducted its observed physical deterioration, $8,433,105, there remains a balance of $28,366,988. That would doubtless have been the valuation which the commission or the majority of it would have put upon the plaintiff's tangible property had they had before them evidence of nothing other than the cost of reproduction new and the observed physical depreciation. There was, however, much other testimony, as for example, as to investment, cost, and many other more or less relevant matters to which they felt in duty bound to give consideration. Having done so, one of them concluded that on December 31, 1923, the fair present value of the plaintiff's tangible property was $25,000,000. The other agreed with him in denying any increase of rates, and valued the same property at the same time, at $26,000,000. The third, or dissenting member, did not make any specific finding on this point.

Taking into account all the various matters considered by the commission, and the others which have been set forth in this opinion, and trying to give to each and every one of them its due weight, we are persuaded that the fair value on December 31, 1923 of plaintiff's physical property did not exceed $26,000,000.

### Going Concern and Working Capital.

In addition, the commission allowed the plaintiff $3,000,000 for going concern value, and found it used as working capital $990,000. There seems to be little challenge of the former figure and none at all of the latter. If there be added to the $26,000,000, the maximum value on December 31, 1923, of plaintiff's tangible property, the total will be $29,990,000.

It should be noted that, according to the plaintiff's books, of its total investment not exceeding $18,060,343.34, not less than $6,343,329.67 went into gas leases, so that all that was employed in the purchase or construction of its physical properties and in

supplying its working capital was $11,717,-013.67. The value of pipe lines, compression pumps, buildings, tools, etc., as expressed in dollars, has become greater as the purchase power of the dollar itself has declined, but as a rule, there has been little, if any, other reason why they should have become far more valuable now than they once were. The supply of such things is not limited. They can be bought and duplicated in indefinite quantities. They are not affected by such causes as those which we shall see plaintiff says have made its gas reserves enormously more valuable.

The facts and conditions being as they are, a valuation of even as much as $26,990,-000 for the physical property and working capital of the plaintiff is explainable only upon the assumption that it has put into that property many millions out of its earnings. There is, of course, no question that it has done this to a very considerable extent, but, even so, the valuation which we have put upon its physical property, its working capital, and its going concern value, would seem to err if at all on the side of liberality.

### Plaintiff's Gas Reserves.

In a sense, at least, the plaintiff owns, or at all events is in a position to own, if it will, the gas and oil under 814,910.68 acres of land. It is seized in fee of them under 41,-969.47, and holds the balance upon what are called leases. The number of these separate documents run into the hundreds or thousands. They have been made at different times, with different men, and under all sorts of varying conditions so that their provisions are by no means uniform. Speaking broadly, however, they are for the most part alike in their general nature. By their terms, the plaintiff obtains from the previous owner of the gas and oil, the exclusive right for a number of years to search for those commodities, and to take them if they are found. As a rule, the plaintiff pays the so-called lessor a cash sum at the time the lease is made. Usually the amount is relatively small, but sometimes it is substantial. So long as the plaintiff merely holds the lease—that is, retains the option to search for gas or oil without actually doing so—it pays a modest annual rent. Usually it may surrender this option at its pleasure, and thereby put an end to its obligation to pay rent for the future. On the other hand, if, at any time during the lease, gas or oil is obtained in a merchantable amount, the term of the lease is automatically extended for so long as it shall continue to flow in such quantities. So soon as the plaintiff begins to take either from the premises, it becomes under obligations to pay a fixed or percentage royalty, the amount of which is much greater than the rent payable during the period of the unexercised option.

In 1909 the plaintiff, at a valuation of $7,233,538.96, took over from its predecessors existing gas leases. The protestants' very able accountant made an analysis of all the available data as to the actual cost of them to plaintiff's assignors, and, as a result, came to the conclusion that it did not amount to as much as $2,000,000. There is no question that the plaintiff, since 1909, has charged the $7,126,454.33 it expended for rentals and royalties to operating expenses. On the other hand, it carried to property account the $1,098,673.02 it paid as bonuses for new leases or for renewals of old, but it has not deducted from that account the $1,535,-917.85 which represented or was supposed to represent the cost to it of leases which it had abandoned. Such a method of keeping its books may show what its prudent investment has been, but tends to obscure rather than to throw light upon the actual present value of its property used and useful in the public service. It is sufficient for the present at least to note the fact, for it does not matter very much whether this $1,535,917.85 shall or shall not be taken into account in determining the present fair value of the plaintiff's property. Even if it should not be deducted, the total cost to the plaintiff of its gas rights does not amount to more than $9,000,000. If to that sum be added the $29,990,000 which we have already found to be the present fair value of all the rest of its property, used and useful in the public service, the total will still be under $39,000,000. As has already been shown, the plaintiff is earning a fair return upon something over $53,000,000. Its right to an increase in rates depends, not upon the cost of its properties, no matter how that be figured, nor from that standpoint is it very important what sum one may find to be the present fair value of any of them other than its gas holdings. It may be allowed all that it can possibly claim on either of these scores, and it will still fail to make out a case unless it shows, first, its gas reserves are now worth many times what it paid for them, and, second, that all, or a large part of them, should be treated as property used and useful in the public service.

### Plaintiff's Reappraisal of its Gas Reserves.

It is of little moment that upon plaintiff's books its rights in gas have been valued at nearly $40,000,000, for four-fifths of

this impressive total, or to be exact, $31,778,-111.42 of it, represents merely the plaintiff's hope, belief, or conviction, as the fact may be, that its gas properties are now worth more than five times the utmost it ever paid for them. On the 21st of December, 1918, it made an application to the commission for permission to raise its charges to domestic consumers and to discontinue service to industrial. Its right to the relief it sought depended in large part upon its convincing the commission that its gas rights had greatly appreciated in value. It accordingly had them valued by an expert, and on the 31st of December, ten days after it had filed its petition with the commission, it credited to its capital account the $31,778,111.42 already mentioned, as the result, so the entry said, of an appraisal. The commission, in fixing the amount upon which the plaintiff was entitled to a return, refused to include this alleged increase, and in the subsequent cases numbered No. 1251 and No. 1516, respectively, it adhered to the position then taken. The Supreme Court of Appeals, in its opinion in Charleston v. Public Service Commission, 95 W. Va. 91, 120 S. C. 398, already cited, reached the same conclusion.

[9] In substance, the instant case resolves itself into an attempt to convince us that in this matter the commission and the court were wrong. The burden of establishing that fact is upon the plaintiff, and obviously is not a light one. It says that the principal ground assigned for this holding by at least one of the commission, in its latest and presumably its most thoroughly considered finding, is altogether technical, that even from that narrow standpoint it is unsound, and that in any event it should be disregarded because something far more substantial is required to justify an order which denies to it the right to get a profit from that which would otherwise yield it a rich return.

The plaintiff moreover argues that neither the court nor the commission has ever denied that it was entitled to a return upon the present fair value of its gas rights. It asserts that all that has ever been decided is that the evidence before those tribunals did not show what those rights were worth. It says that, if any shortcoming in that respect ever existed, it has been made good in the pending case.

## Nature of Plaintiff's Title to Its Gas Reserves.

In case No. 1516, in which was made the order which we are asked to say is confiscatory, one of the two commissioners constitut-

ing the majority said that under such leases as those held by the plaintiff there passed "no title in the gas to the lessee, and that title to the gas remains in the lessor, and it continues as his property until it is extracted, when title vests in the lessee," citing Headley v. Hoopengarner, 60 W. Va. 626, 55 S. E. 744. As a consequence, he found that, while the plaintiff had many gas leases, it owned no gas except the comparatively small quantity in which it held the title in fee. He recognized that, if the appreciated value of plaintiff's property could be shown, that appreciation must be recognized and treated as part of the rate base, but he said the value must be of something "which the utility owns, to which it has title, and on which it pays taxes." As the plaintiff's evidence relating to the increase in value dealt solely with "gas reserves" and "gas acreage," it was in his view beside the mark. No testimony had been offered as to the worth of the leaseholds as such and subject to their varying terms, conditions, and limitations. He therefore held that, as no other value of the leaseholds had been shown, they could not be taken to be worth more than their book cost, which on the 31st of December, 1923, he said was $6,-343,329.67. The other commissioner, who united in denying the increase asked for, seems to have taken substantially the same view, although he put upon them a valuation of $10,500,000.

These commissioners were unquestionably right in so far as they concluded that a fee-simple title to all the gas under a given acreage would be worth more, perhaps far more, than are mere rights to extract the gas under the same land when such rights are held under a thousand separate leases, containing varying terms and conditions expiring at different times, all calling for the payment of rents and royalties, and to prevent the lapse or forfeiture of some of which constant vigilance is required. On the other hand, one of the commissioners went into a somewhat elaborate discussion of the legal differences between the various kinds of titles or rights to or in gas still under the surface, and by so doing has led the plaintiff to feel, perhaps not unnaturally, that too much stress was laid upon purely technical considerations, and that as a consequence substance was sacrificed to shadow. As already pointed out, there is a real difference between the value of what plaintiff has and what it would have were its title a fee-simple one, but, for all that, plaintiff may be right in claiming that, when one comes to express that difference in terms of dollars and cents, prac-

tical rather than technical considerations must govern.

### Plaintiff's Contentions as to the Value of Its Gas Reserves.

In some of the opinions which held that the plaintiff had not proved that its gas rights were worth much more than it paid for them, it was said that it had not offered in evidence the leases or contracts under which they were held. In the instant case, it has attempted to meet this criticism by submitting to the court specimens of many of the forms generally used by it, and has furnished tables which purport to classify those actually in force with particular reference to the payments which under them it is or may be called upon to make, and, as we understand, by throwing open the originals of all of them to such inspection as any of the parties to the cause or the court, may see fit to make of them. That is a privilege of which a special master might well avail himself, but of which it is impractical for us or any of us to make use.

### The Evidence of Mr. Davis.

The plaintiff put on the stand Mr. Ralph P. Davis, of Pittsburgh, a consulting engineer and geologist of wide experience. He was for a time director of the School of Mines of the University of Wisconsin and instructor in applied geology. As a result of his examination of the deeds, leases, and contracts held by the plaintiff, he says that on the 31st of December, 1923, the plaintiff owned either the gas, or the exclusive right for a period of years to drill for and extract gas underlying the 814,910.68 acres of land already mentioned lying chiefly in West Virginia, but partly in Kentucky near the West Virginia border. More than three-fifths of this total acreage, or, to be precise, 552,319 acres, is located in territory in which it is not yet shown that there is any substantial probability of finding gas. Of the remainder he says, 126,208 acres are in what he calls probable territory; that is, in territory in which it seems likely gas will be found. He classifies 136,384 acres as proven territory. The slightest shade over one-half of this, or 68,981 acres, were at the time being operated by the plaintiff, treating, as we have throughout this opinion, certain subsidiary companies absolutely controlled by it as its mere agencies.

In this operated territory, the gas in the porous underlying rock strata is gradually being consumed by the plaintiff's customers, and apparently the same is also in a sense at least true of the 67,483 acres which Mr. Dav-

is describes as proven, but which are not part of what he calls operated territory. If we correctly understand his testimony, he includes in proven territory only that which lies in the boundary of the producing pool from which the plaintiff is obtaining gas. He says: "In a few localities, pools or portions of pools are almost entirely controlled by foreign interests, and these areas, although highly productive, are not classed as proven, for the reason that their reserves are of no avail to the" plaintiff. Mr. Davis, as has been stated, says plaintiff controls 126,208 acres in the territory which he regards as probably underlaid with gas, but as to which that fact has not yet been established.

### Questions as to Value of Gas Reserves.

Among the questions raised by the claim of the plaintiff, that the value of the gas under these various classes of acreages shall be treated as part of the value upon which it is entitled to a return, are, first, What is the amount of the gas under each class? second, What is its present value? third, How much of that value is presently used in the public service?

### Amount of Gas Controlled by Plaintiff.

Mr. Davis estimated the gas under the proven territory at 249,100,000 M. C. F., and under the acreage he classed as probable 414,600,000, a total of 663,700,000. It will do no good to state the methods he followed in making these estimates. It will suffice to say that they appear to have been well thought out by a highly qualified expert and to have been carefully applied. In the first instance, he used the same way of arriving at the amount of gas under the merely probable as he employed in estimating that under the proven. He then, however, examined much more closely the available data as to each section of that which he classed as probable, and made some discount from the total at which he had at first arrived. These discounts vary, but they averaged 38 per cent., so that his total of gas lying under the probable acreage is but 62 per cent. of what it would be had he felt himself justified in treating that acreage as he did proven territory. His testimony stands uncontradicted. Indeed, he is the only witness on either side who has attempted to make any estimate at all. Doubtless his may be taken to be as accurate as anything of that kind can ever be. He does not attempt to as much as approximate the amount of gas which is or may be under the larger acreage which he classes as possible gas territory.

### What is the Value of Plaintiff's Gas Reserves?

The plaintiff undertook in three different ways to prove the present value of its Gas Reserves.

### The Valuation by Mr. Davis.

The first was by the method used by Mr. Davis. That gentleman first satisfied himself that there was at present a market for such gas in and around Pittsburgh, in which locality he was convinced steel mills would pay 35 cents per M. C. F. for it. He believes that in the future it will probably command a higher price, but in his calculations he ignores that possibility. In transporting the gas from Cedarville, W. Va., to Pittsburgh, there will be some loss by leakage. It will also cost, according to Mr. Uebelacher, 5.26 cents per M. C. F. to transport the gas from one place to the other, so that he figures the difference in the value of the gas at Pittsburgh and the cost in delivering the gas from Cedarville to Pittsburgh to be 27.99 cents. He then figures out what in the past has been the cost of producing and delivering gas at Cedarville, and estimates what it will probably be in the future. By deducting these costs per M. C. F. from the 27.99 cents, he determines the profit which he thinks the plaintiff will make on each M. C. F. of gas which it may sell. In calculating the expense of producing and delivering the gas in the years to come, he makes allowance for the probable upward trend in the cost of production. Having ascertained in this way the probable profit in each particular year from 1924 to 1941, each inclusive, he reduces that amount to its present worth by using a discount figure based upon an 8 per cent. value of money. The sum total of these yearly profits so reduced to present worth, is $32,458,129.17, and that he figured was the actual value of the gas at the end of 1923. It should be noted, however, that of this $32,458,129.17, a sum which we figure to be $4,967,291.46 was the profit Mr. Davis calculated the plaintiff would earn during the eight years immediately subsequent to 1923, upon the gas which it did not own, but which it had contracted to buy. That amount is not a part of the present worth of the gas belonging to the plaintiff. Deducting it from the total given by Mr. Davis, leaves the valuation for the gas plaintiff owns, $27,490,837.71. Whether plaintiff's contracts to purchase gas at favorable rates should be regarded as part of its property upon which it is entitled to a return may be an open question, but, if it is, it was never raised in such a way as to call the attention of the state court, the commission, or ourselves to it. The writer of this opinion did ask Mr. Davis, when on the stand, why he included the gas purchased in his calculations. From his answer at the time, we did not understand the matter was of much importance as it is. Doubtless it was our fault that we did not. In any event, the fact that the plaintiff can buy gas at a price which, according to the calculations of Mr. Davis, would yield it such a large profit in the open Pittsburgh market, suggests, at least, that such a figure is not so certainly obtainable as Mr. Davis assumes it to be, for, if it be, plaintiff's sellers would not perhaps have been so willing to make it so large a present. Moreover, it is under contract, during 1924, 1925, and 1926, to sell large quantities of gas to the Hope Gas Company and the West Virginia Gas Company, at a price per M. C. F. of 22.65 cents.

The future may show that he is right in supposing the natural gas for the next eighteen years will be saleable at Pittsburgh for an average price of not less than 35 cents per M, but it is not something about which anybody can be certain. It depends upon what shall be the relative costs of other fuels or means, electric or other, of obtaining heat, the continued activity of the steel business, and many other equally unstable factors. Moreover, the conclusion of Mr. Davis that gas will now and for the future command 35 cents in Pittsburgh, if true, has a possible significance apparently not dreamt of in connection with plaintiff's contention.

If plaintiff's gas delivered at Cedarville is really worth the figure Mr. Davis thinks it is, the return which its two stockholders receive from it is in fact much higher than the Commission assumed. In 1923, they took from it 17,613,173 M. C. F. At the price which Mr. Davis says it was worth (that is 27.99 cents) they would have paid for it $4,929,927.12. They actually paid $1,282,100.69, or $3,647,826.43 less than according to him, was its real value. Deducting therefrom 12½ per cent. for federal income tax, or $455,978.31, there is left $3,191,848.13, or $1,048,186.67 more than the amount which the commission added on that account to plaintiff's net income. This sum is 11.65 per cent. on $8,997,310.48, and the commission's total, is sufficient to pay that return upon $58,858,872.27. It would seem to follow that, if Mr. Davis was right in concluding that plaintiff could get 27.99 cents a thousand for its gas, it really earned in 1923 a fair return upon no less than $67,856,182.65, which is about all that either the plaintiff or any one else claims

that the property used in the gas department of its business is worth.

It should be said that, while Mr. Davis, as has been before stated, figured the amount of gas under what he classed as proven and probable acreage at 663,700,000 M. C. F., for some reason, in valuing it, he figured on the worth of but 636,100,000 M. C. F. of it. If we apportion his total valuation when corrected by deducting from it the profit on purchased gas included therein, between the proven and the probable territory in the ratio he originally calculated to be under them respectively—that is to say, 37.53 per cent. under the proven and 62.47 per cent. under the probable—the result will be a value under proven of $10,317,311.39 and under the probable of $17,173,526.32.

### The Valuation by Mr. Uebelacher.

Mr. Uebelacher proceeded upon the theory that "the measure of the value to the owner or lessee of the gas in the ground is the difference between the prevailing market price at which such owner or lessee can purchase gas delivered to the field mains and the cost to such owner or lessee of purchasing and maintaining in its own wells an equivalent supply of gas at the same point of delivery." He made elaborate calculations to determine that difference, and concluded it was 5 cents. The accuracy of this determination is not susceptible of absolute demonstration. Some of the factors which were used in arriving at it were not in themselves altogether certain, and, in ascertaining them, there was plenty of room for the exercise of individual judgment. He was an expert witness for the plaintiff, and as such doubtless subject to some subconscious bias in its favor. On the other hand, there is no reason to suppose that he did not try to be fair, and there is no room for question that he was both able and painstaking.

Having made up his mind that the plaintiff could get gas from its own wells at 5 cents per thousand cheaper than it could buy it, he assumed that it was easy to say what the present value of plaintiff's gas reserves was. All that he thought necessary was to multiply the quantities of thousands according to the estimate of Mr. Davis by 5 cents and accept the result. In this way, he valued the gas under the proven territory at $12,455,000 and under the probable at $20,730,000 or a total valuation for both of $33,185,000.

It will be recalled that Mr. Davis, although he dealt with the problem in a radically different way, arrived at almost precisely the same valuation. His figures were $32,458,-129.17. The difference between him and Mr.

Uebelacher is only $726,870 or less than 2½ per cent. This agreement would be very impressive, were it not that each bases his figuring upon what he assumes is the price which can be obtained for gas at Pittsburgh. Unless one or the other or both of the methods used are fallacious, a concurrence of result would have been impossible unless they had been at one as to the one factor which was common to both. Now it is a striking illustration of the uncertainty of such calculations as they have severally made that, instead of agreeing as to the Pittsburgh price, Mr. Davis assumed that it was and would be 35 cents per M. C. F., while Mr. Uebelacher estimated it at 30 cents. This price is to be paid at intervals over eighteen years, and Mr. Davis has figured for us that every dollar so received has a present worth of 61.64 cents, so that an average difference of price of 5 cents per M. C. F. over the entire period should make a difference of 3.082 cents on the present worth of each thousand feet of plaintiff's reserves or for the 663,700,000 M. C. F. of $20,455,234. As Mr. Uebelacher based his calculation upon a price of 30 cents at Pittsburgh, his totals should have been that much less than those of Mr. Davis, who more optimistically assumed than 35 cents a thousand could be obtained at that point for it. We have seen that in fact they were $726,870 more.

Perhaps, if this case shall go further, an examination of the detailed calculation of each of the gentlemen, and a more intensive study of them than we have been able to give, will explain the apparent discrepancy which for the present makes it difficult to give either of them the weight to which by possibility one or the other or both of them may be entitled. That, however, in the first instance will be work for a special master.

### The Valuation of Witnesses in the Gas Business.

Among the witnesses who testified before the commission were five practical gas operators, who have bought, sold, leased, or managed gas properties in or near the territories where the plaintiff's holdings are. One of these valued the plaintiff's gas reserves under all its territory, proven, probable and possible, at $30,000,000, one at $34,000,000, a third at $35,000,000, the fourth, who originally testified to a valuation of $39,000,000, subsequently, for reasons to be presently stated, reduced his total to $31,250,000. The fifth of these gentlemen said that the plaintiff's gas holdings were worth $45,000,000. The average for the first four, taking the corrected figures for the one who reduced his original val-

nation, is $32,500,000, a figure very close to those given by Messrs. Davis and Uebelacher for the gas under the proven and probable territory alone. These business witnesses were all highly competent men. Every one of them is, however, interested in natural gas companies. Perhaps it would be not unnatural to suspect that they are inclined to think well of properties similar to that of which they are part owners. It is scarcely possible that their judgment remains altogether uninfluenced by the fact that the judicial decision of some of the questions raised in this case may be of great importance to their own companies.

The worth of such properties depends upon many contingencies, some of them difficult or impossible to foresee. For example, as already mentioned, one of the witnesses first placed a valuation of $39,000,000 upon plaintiff's gas holdings, but subsequently reduced that total by one-fifth, or to $31,250,000, because in the meantime another large company had come or had arranged to come into the territory in which plaintiff's properties lie.

#### Conclusions as to the Value of Plaintiff's Gas Reserves.

It is not easy to value plaintiff's gas holdings. As has been shown, every one of the various methods by which the plaintiff has attempted to do so is open to serious criticism. No one leaves upon the mind the conviction of certainty or finality. Doubtless as a whole the rights are worth a good deal more than the plaintiff paid for them, and they may approximate three times as much as the most they ever cost it. For reasons to be presently, stated, we do not think we are called upon to make a definite finding on that question.

#### How Much of Plaintiff's Gas Reserves are Used in the Public Service.

The plaintiff, at a net cost of a few millions, acquired rights which it claims have now a value of upwards of thirty, and which it might be difficult to deny were worth two-thirds of that sum. What proportion of this is presently used and useful in the public service? Roughly, four-fifths of the valuation it puts upon them is represented by gas which upon reasonable grounds it believes to be under land in which it has not yet operated and nearly two-thirds under acreage underneath which it has not yet been demonstrated that there is any gas, although its presence there is probable. Plaintiff is not to be criticized for acquiring these rights widely extended and largely untested as they are. In

securing them, it doubtless acted wisely, both from its own standpoint and from that of those who depend upon it for their supplies of gas. But is that of any present importance?

[10] The plaintiff denies that it can properly be limited to a return upon its investment, and cites decisions of controlling force in support of its position. Its right to relief is nevertheless absolutely dependent upon its being able to maintain the position that it is entitled to a fair return upon the present value of such of its property as is used and is useful in the public service. Whether it showed good judgment in acquiring and holding any other property is irrelevant to any issue upon which it here seeks a decree. No part of the gas which is supposed to be under the acreage classed as either probable or possible is "used" in the public service or for that matter in any other, in any ordinary sense of that word.

Mr. Davis, as we have seen, valued the gas owned by the plaintiff and under the 136,-834 of proven territory, operated and unoperated at $10,317,311.39. On December 31, 1923, plaintiff was operating only 68,981 acres or 50.58 per cent. of these. The total supply of gas under this operated territory, calculated according to his methods, was then 124,994,780 M. C. F., and was worth, he estimated, $5,218,496.50. There was under the acreage which he classed as proven but not operated an additional 124,-105,220 M. F. C., valued by him at $5,098,-814.89. If we are right in our understanding of his testimony, it would perhaps be possible to claim that all of the gas in both classes was tributary to the territory which was in operation, in the sense that the plaintiff was drawing from the pools containing it. It will be noted that the total of the gas underlying the proven acreage was 249,100,000 M. C. F. As the plaintiff sells annually about 47,000,-000 M. C. F., of which 10,500,000 goes to the West Virginia retail purchasers, it has under its proven territory gas enough for everybody for more than five years, and an amount sufficient to meet the needs of its public service patrons alone for almost a quarter of a century.

For the reasons already stated, we cannot see how any other portion of its gas can be held to be used in the public service, no matter how elastic a definition be given to the word "used." At the risk of tiresome repetition, we can say that we do not criticise plaintiff for acquiring any or all its gas rights. It was doubtless wise to get them. All that we decide is that, in arriving at the

rate base upon which plaintiff is entitled to a fair return, we may not combine two opposing theories. We are not justified in saying that, because plaintiff's investments in gas reserves were prudent, those reserves immediately went into use, and that therefore plaintiff is entitled to have them appraised at the many times higher value it says they now have. If, in dealing with its tangible property and going concern value, we are required to ignore, except for check purposes, plaintiff's investment in them, we must apply the same rule to its gas reserves.

If we are right, $10,317,311.39 is the highest valuation which can be put upon such portion of plaintiff's reserves as it has any claim to include in its rate base. Even that much can be allowed only upon the assumption that any considerable part of these reserves is in use in the same sense as are pipe lines, pumps, compressors, and many other things. But, is that assumption correct? The ordinary public utility is essentially the supplier of a service, whether it is also a manufacturer or even to a limited extent a merchant. This is true, although it may furnish something such as artificial gas or electricity which is also an article of merchandise.

The peculiarity of the instant case is that the plaintiff not only serves its domestic and retail customers in West Virginia as any other utility would do, but that it is also engaged on a very large scale in the business of selling to them and to others, principally to the latter, an article of which it has accumulated a supply ample for a number of years to come, but which is consumed in the use and cannot be replaced except possibly by the acquirement from others of additional supplies out of the definitely limited quantities now in existence. If it bought from some one else the gas which it distributes in Charleston, Huntington, and other West Virginia places, what it paid to the seller would form a part of its operating costs, at least whenever it and the seller had no connection with each other and dealt at arm's length. In that event, the value of the gas reserves owned by the concern which sold the plaintiff gas would have nothing to do with the value of the latter's property, used and useful in the public service.

[11] Is it clear that the situation in this respect is different merely because the plaintiff owns the gas it furnishes? If it is not, we are not here concerned with the valuation which may be placed upon plaintiff's gas reserves or upon any important part of them. Upon the assumption suggested, commissions and courts, when called upon to deal with the rate which the plaintiff is entitled to charge, would, as in other like cases, have to determine the value of the plaintiff's tangible property used in the public service, including therewith a sufficient allowance for working capital and going concern value. The total of these items would represent all upon which it would be entitled to earn a return and all upon which any allowance for depreciation and amortization should be made. Having determined what the plaintiff's gross income is, precisely as they would in any event have to determine it, they would add the fair market value of the gas it delivers to its public service customers to what they had ascertained to be its outlay for operating expenses and taxes. It would then be necessary to determine whether such net income as so calculated, after making proper allowance out of it for depreciation and amortization, was sufficient to yield plaintiff a fair return upon the value of its property used in the public service. However plausible this view may be, it does not seem to have occurred to any of the parties to the cause nor to any of the learned counsel engaged in it. So far as we can recall, no reference has ever been made to it by the commission nor by the Supreme Court of Appeals of the state. The presumption against it is therefore strong, but on the other hand, it has something of apparent reasonableness about it, for West Virginia cannot require plaintiff to sell its gas in the state if it can get a higher price elsewhere. Pennsylvania v. West Virginia, 262 U. S. 553, 559, 43 S. Ct. 658, 67 L. Ed. 1117, 32 A. L. R. 300. If it be sound, there will be no need to seek a solution of a number of problems which are difficult or impossible to solve. At present we do no more than propound it, so that in the further proceedings in the cause, it may be given such consideration as it may merit, if indeed it be worth any at all.

### The Maximum Valuation of the Property upon which the Plaintiff Is Entitled to a Return.

We have heretofore stated that we were satisfied that the value as of December 31, 1923, of all the plaintiff's property other than its gas reserves did not exceed $29,990,-000. The highest possible value which on the day named could be put upon such portion of its gas reserves as could by any possibility be considered as then used in the public service was $10,317,311.39. The total of these sums or $40,307,311.39, is the maximum upon which the plaintiff was then entitled to

a return. We do not fix that amount as its rate base. We cannot do so without answering some questions which we have purposely left open. All that we decide is that upon the record before us a higher figure would be unjustified.

### Plaintiff's Business as a Whole Yields a Fair Return.

We have already ascertained that the net income, which in the year 1923 it earned for its stockholders, was sufficient, after providing for depreciation and amortization, to pay a fair return upon at least $53,295,278.24. While it is true that, if all plaintiff's contentions were accepted at their face value, it might be possible to argue that its business as a whole did not pay it a fair return as it calculates such a return, yet it has never claimed that its entire operations, considered as a unit, have been unprofitable in the ordinary sense of that term. Indeed it could not. It, or a substantially identical predecessor, was organized in 1903, but it did not begin operations seriously, if at all, until some time in 1909, when it took over the properties of two or three previously existing corporations. How much actual money was ever put into it is not quite clear. The aggregate did not exceed $6,000,000 and it may well have been less. Until April, 1916, it paid no cash dividends, but between that time and the end of 1923, its stockholders have in that way received a total of $28,024,900. Indeed, as has already been mentioned, that is not all which they have had from it. In the last few years, as has been stated, it has made a practice of selling much gas to them at prices admittedly greatly below the market, to their advantage in a sum which will run into the millions, and which the protestants, not without reason, argue amounted to as much as $7,655,722.32. It follows that, in the fourteen years and a half since its organization, its stockholders have taken out of it somewhere between $30,000,-000 and $35,000,000 in money and money's worth, or from five to six times as much as they say they put in it, nor, if their view be accepted, have they beggared it in the process. They claim that on the last day of 1923, the fair value of that portion of its property which they have left to it and which is used in the gas department of its business was at the lowest $66,070,496, while it owed only $12,060,343.34, so that its net worth was at least $54,010,152.66, or nine times the utmost they ever intrusted to it. Moreover, if we correctly understand the figures submitted, this sum leaves altogether out of account an addi-

tional $13,343,176.15 of value, which it says is the worth of the property it uses in the other departments of its business, and which is also the product of the original $6,000,000 its stockholders invested in it. It has not proven an unprofitable servant.

The large valuation it places upon its holdings is, in spite of the fact that it has sold from its own wells over 400,000,000 thousands of cubic feet of natural gas, a commodity which does not reproduce itself and which perishes in the using. Its expert witnesses we know say that it has 663,000,000 thousands of cubic feet still left. Even if they are right, it has already sold more than a third of all the gas it ever had, and they assert that on the 31st of December 1923, its property was still worth nine times as much as they originally put into it. It is the story of the Sybilline books put into modern dress.

None of this, the plaintiff says, has anything to do with the case. It asserts that the exceptional good fortune which has come to it in the way of an unusual increase in the value of the property it is using in the public business, justifies it in saying that rates are confiscatory which would have been entirely fair had it had no better luck than that which falls to the lot of most mortals. To any suggestions that it is seeking to have fulfilled for its benefit the prophecy that to him that hath shall be given, it answers that it is entitled to rates which will pay a fair return upon the value of its property used and useful in the public service for which the charges are made, as that value stands at the time those rates are in force. In its view, it is immaterial how such value compares with the prices it paid for the property. That circumstance and others of a similar kind, it contends, are relevant only for such light, if any, as they may throw upon present worth.

### The Regulated Portion of Plaintiff's Business.

If we are correct in the conclusions to which we have thus far come, there is no occasion for any one to challenge these positions of plaintiff, even if it be assumed that any of them are open to controversy, with the possible exception of the implication that its regulated and unregulated business are to be regarded as distinct entities.

It furnishes gas to two kinds of customers. A little more than one-fifth of all it produces or buys from others it distributes directly to industrial and domestic consumers in West Virginia. A smaller amount goes to the like kind of patrons in Kentucky and Ohio. It sells the remainder to certain wholesale customers, individuals and corporations who for

the most part are not themselves its ultimate users, but who transport, distribute, and sell it at retail in states other than West Virginia. It says that the former portion of its business does not yield a fair return, whatever may be the case with reference to the latter. Its adversaries claim that, so long as what it gets from its gas business as a whole is profitable, it cannot say that its property or any part of it, is being confiscated or is being taken from it without due process of law. They assert that it is well settled that it is a public service corporation as to all of its gas business. Clarksburg Heat & Light Co. v. Public Service Commission, 84 W. Va. 638, 100 S. E. 551; Carnegie Natural Gas Co. v. Swiger, 72 W. Va. 557, 79 S. E. 3, 46 L. R. A. (N. S.) 1073; People's Natural Gas Co. v. Public Service Commission, 279 Pa. 252, 123 A. 799. It could not have constructed its miles of pipe line if everybody had not known that it could on occasion exercise the power of eminent domain. Without such means of transmitting its gas, it could not carry on either branch of its business. The fact that the commission has not seen fit to regulate its wholesale prices and has not interfered to prevent its discriminating among its wholesale customers, by selling to one at one price and to another at a very much higher or lower one, is immaterial. If, as it claims, the rates it is forced to allow its retail customers discriminate unfairly against its wholesale, the latter may have a right to complain, but it may not so long as in the aggregate it is getting a fair return upon all its property used and useful in the public service.

It answers that, for the commission to compel it to make a present of any part of the value of any of its wares to anybody, is to take from it property without due process of law. The question is important. Is it necessary to answer it?

### The Regulated Portion of its Business. Net Income.

There is little difficulty in ascertaining the gross earnings of the regulated portion of its business. In 1923 they were $2,307,051, to which should be added a proper proportion of the plaintiff's gasoline earnings, which it is agreed is $234,626, so that the total gross income of the plaintiff's regulated business in the year named was $2,541,677. Subject to a reservation presently to be mentioned, it is admitted that its operating expenses and taxes amounted to $986,084; thus leaving a net income of $1,555,593. The reservation mentioned is as to an item of $147,945, a part of a still larger sum which the plaintiff expended in the payment of delayed rentals to preserve its leases or options in unoperated territory. It is admitted that, if the plaintiff is entitled to include such outlay in its costs of operation, the amount above named is properly chargeable to the public service portion of its business.

From what has been said, it is clear that we cannot hold that they, or any of them, are charges upon the property of the plaintiff used and useful in the public service. It may not, however, necessarily follow that they are not expenses which a utility situated as is the plaintiff may in good faith, pay out of and properly charge against its current operating income. It is another of the questions which as they need not be decided, we content ourselves with noting.

It may be said that the total of these delayed rentals amounting to $589,186 were included in the operating expenses which we deducted from the plaintiff's gross income from its entire gas business in order to arrive at the net sum available for depreciation, amortization, and return. Had we not done so, the net income would have been sufficient to provide for these charges on a valuation of five millions higher than has heretofore been calculated.

If we deduct from the net income of the regulated portion of its business, $1,555,593, the proper proportion of the total sum allowed for annual depreciation, or say $113,658, there is left $1,441,935, a sum sufficient to yield a return of 11.65 per cent. on $12,377,124.42.

### Value of Property Used in Regulated Business.

[12] What, on the 31st of December 1923, was the fair present value of that part of plaintiff's property used in the regulated portion of its business? We have found that all of its tangible property was not worth more than $26,000,000. The parties have agreed as to percentages of the value of various portions of this property properly allocatable to its public service activities. Applying them, we find that of such $26,000,000, approximately $7,530,826 will represent the highest valuation which can be put upon the tangible property used in the part of plaintiff's business with which we are now concerned. Of the $3,000,000 allowed as going concern value, $847,350 belongs in the same category; as does $282,546 of the $990,000 of working capital. The total is $8,660,822. Of the $10,317,311.39, which is the highest valuation which we have found we could put upon plaintiff's gas reserves, upon the assumption

that any appreciable part of them may be included in its rate base, there should be allocated to the regulated portion of the business $2,590,677. It follows that the total value of plaintiff's property of all kinds used and useful therein did not exceed $11,251,499. As the plaintiff received from this part of its business an income sufficient to pay a return upon $12,377,124.12, or $1,125,624.12 more than the maximum worth of its property used therein, we cannot hold that the commission erred in denying it an increase of rates.

### Application of Amortization Reserves.

We have not overlooked the fact that, in the view of the commission, or at all events, of that member of it who delivered the principal opinion, account should be taken of the reserve which the plaintiff has already accumulated for purposes of amortization. The plaintiff's rates have been for years fixed by the commission. They purposely have been made high enough to permit the laying aside of huge sums for amortization, and the plaintiff either has them, or has distributed them among its stockholders. It says these facts, if facts they are, are immaterial to any question before the court. Its theory perhaps is there is a new, taking of its property every time there is an attempt made to raise or lower a rate and whether it has in its depreciation or amortization reserve any sums large or small is beside the mark. We state the position of the parties. The exigencies of the case do not require that we should express any opinion upon them, and we do not.

### Conclusion.

In our consideration of the case, for income and outgo, we have used the figures for the calendar year 1923. If the case shall go to final hearing and a reference be had to a special master, either of the parties will, of course, be free to bring everything down to a convenient date, say the end of 1925 or any later date that would be practical.

This opinion has been too long delayed, and is of inordinate length. In the way we approached the consideration of the case we were called upon to deal with numberless figures scattered through many exhibits. We have been tempted into not a few calculations. It is not only possible but probable that we have fallen into arithmetical as well as other errors. All that we can say is that, from the best consideration we have been able to give to the case, we do not feel that the plaintiff has shown that it is entitled to a preliminary injunction. Upon final hearing, we shall not necessarily consider ourselves bound by any

14 F.(2d)—15

of the findings of fact or conclusions of law herein contained. All of them will then be open to further consideration.

As the record now is, the motion for an interlocutory injunction must be denied.

McDOWELL, District Judge, dissents.